WILLIAM J. ROCHE, Individually and as Executor of HENRY T. NASON, Deceased, Respondent, *v.* PAUL FORD NASON et al., Appellants, et al., Respondents.

1. WILL — PROOF OF WILL EXECUTED IN DUPLICATE. In an action to establish the validity of the probate of a will purporting to have been executed in duplicate, in which one of the duplicates was received in evidence, an objection by the defendants to the introduction in evidence of the other duplicate, and its withdrawal by the plaintiff, precludes the defendants from insisting that the proof is insufficient to establish the identity of the two instruments.

2. SUICIDE OF DECEDENT. Where the record discloses no evidence to warrant the inference that either a will or codicil thereto was made with an intent upon the part of the decedent to take his own life, the mere fact that a few days after the execution of the codicil he came to his death by his own hand does not justify such inference.

3. TESTAMENTARY CAPACITY. Proof that insanity had been manifested in the ancestry of decedent will not support an inference of mental unsoundness in the absence of evidence tending to show any manifestation of mental derangement during his life; nor does the fact that he committed suicide, of itself, in the absence of any other evidence as to his mental condition, warrant the deduction that his mind was unsound at the time or prior thereto, or that he lacked testamentary capacity.

4. EVIDENCE — STATEMENTS OF PHYSICIAN AS TO CONDITION OF PATIENT — CODE CIV. PRO. § 834. The exclusion of questions to a physician in charge of a sanitarium, in which the decedent had been a patient some months before the execution of his will, as to his condition physically and mentally when he arrived there, and whether he was treated there for any physical ailment, and the striking out of such physician's statement that decedent was treated for a neuresthenic affection, while improper, in view of the fact of an express waiver by the defendants of the provisions of section 834 of the Code of Civil Procedure, does not constitute reversible error, where it is manifest that the rulings could not have substantially harmed the defendants.

5. SAME. Questions to decedent's physician as to why he permitted him to go to the sanitarium and as to what decedent had said to him concerning his health at a specified time, are also properly excluded as immaterial upon the question of testamentary capacity.

*Roche* v. *Nason*, 105 App. Div. 256, affirmed.

(Argued April 26, 1906; decided May 8, 1906.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the third judicial department, entered May 18, 1905, affirming a judgment in favor of plaintiff entered upon a verdict directed by the court.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Jeremiah K. Long* and *Andrew P. McKean* for appellants. Where two papers are executed as duplicate wills neither can be admitted to probate without conclusive affirmative proof that it is in every respect a duplicate of the other. (*Crossman* v. *Crossman*, 95 N. Y. 149; *Delafield* v. *Parish*, 25 N. Y. 29; *Matter of Burtis*, 43 Misc. Rep. 445; *Matter of Andrews*,

162 N. Y. 5; *Matter of Whitney*, 153 N. Y. 264; *Matter of Kennedy*, 167 N. Y. 163; *Matter of Fults*, 42 App. Div. 594; Code Civ. Pro. § 2622.) There was no proof before the surrogate, and no proof at the Trial Term that the papers admitted to probate were duplicates of any other papers. There was no proof in either court that they were the duplicates which Judge Nason published as his will and codicil. (*Matter of Kennedy*, 167 N. Y. 170.) The proof is that Judge Nason declared but one paper to be his will, and but one paper to be his codicil. There is no proof that the papers admitted to probate are the ones he published. (*Matter of Whitney*, 153 N. Y. 264; *Matter of Andrews*, 162 N. Y. 5; *Delafield* v. *Parish*, 25 N. Y. 29; *S. Nat. Bank* v. *Weston*, 172 N. Y. 250.) The exclusion of the testimony of the physicians as to their observations of, and their talks with, and their knowledge of, the insane mentality of Judge Nason is reversible error. (*Holcombe* v. *Harris*, 166 N. Y. 263.) Undue influence may be predicated on circumstances, and the relationship of the principal beneficiaries to Judge Nason puts the burden on them of showing affirmatively that there was no undue influence, and that Judge Nason was competent. (*Matter of Rintelen*, 37 Misc. Rep. 462; *Matter of Will of Smith*, 95 N. Y. 523; *Matter of Keefe*, 27 Misc. Rep. 618; *Matter of Green*, 67 Hun, 537; *Delafield* v. *Parish*, 25 N. Y. 29; *Marx* v. *McGlynn*, 88 N. Y. 371.) If the alleged will and the alleged codicil, or either, or both, were made with the intent on the part of Judge Nason to take his own life, they are void as against public policy. (*Kujek* v. *Goldman*, 150 N. Y. 178; *Darrow* v. *F. F. Society*, 116 N. Y. 542; *Riggs* v. *Palmer*, 115 N. Y. 516; *Cook* v. *White*, 43 App. Div. 392; *Delafield* v. *Parish*, 25 N. Y. 29.) It was error in the trial court to refuse to let the contestants go to the jury on the questions of insanity and suicidal intent. (*McDonald* v. *M. St. Ry. Co.*, 167 N. Y. 66; *Hagan* v. *Sone*, 174 N. Y. 317; *Sundheimer* v. *City of New York*, 176 N. Y. 497; *Second Nat. Bank* v. *Weston*, 161 N. Y. 529; 172 N. Y. 254.)

*Edward W. Douglas* for plaintiff, respondent. All the facts and circumstances necessary to satisfy the surrogate of the genuineness of the will and codicil and the validity of the execution of both papers were before the surrogate when he admitted the will to probate. (Code Civ. Pro. § 2622 ; 2 R. S. 63, § 40 ; *Matter of Andrews,* 162 N. Y. 5 ; *Matter of Wilson,* L. R. [1 P. & D.] 269 ; Williams on Executors [9th Eng. ed.], 72 ; *Ela* v. *Edwards,* 16 Gray, 91 ; *Jones* v. *Habersham,* 63 Ga. 146 ; *Matter of Collins,* 5 Redf. 20 ; *Matter of Tighe,* 24 Misc. Rep. 459 ; *Matter of Snell,* 32 Misc. Rep. 611.) The burden of showing the invalidity of the will and codicil was on the contestants. (*Cook* v. *White,* 43 App. Div. 388 ; *Dobie* v. *Armstrong,* 160 N. Y. 584 ; *Phillips* v. *Phillips,* 77 App. Div. 113, 121 ; *Haughian* v. *Conlan,* 86 App. Div. 291 ; *Hawke* v. *Hawke,* 82 Hun, 439 ; 146 N. Y. 366 ; *People* v. *Koerner,* 154 N. Y. 355 ; *Pringle* v. *Burroughs,* 100 App. Div. 366 ; *Myer* v. *Myer,* 184 N. Y. 54 ; *Walsh* v. *People,* 88 N. Y. 458 ; *Mock* v. *Garson,* 84 App. Div. 69.) There was no exclusion of testimony which calls for reversal of this judgment. (Buswell on Insanity, 383, par. 383 ; *Matter of Keidaisch,* 13 N. Y. Supp. 255 ; *Matter of Bush,* 22 N. Y. S. R. 864 ; *Hoyt* v. *Ross,* 20 N. Y. Supp. 521 ; *Ivison* v. *Ivison,* 80 App. Div. 602 ; *Delafield* v. *Parish,* 25 N. Y. 10 ; *Hoey* v. *Hoey,* 53 App. Div. 208 ; *Matter of Snelling,* 136 N. Y. 517 ; *Hagan* v. *Sone,* 174 N. Y. 320 ; *Matter of Donohue,* 97 App. Div. 205 ; Page on Wills [1901], § 85.) The direction of the verdict by the trial court was right. There was no evidence in the case which would warrant its submission to the jury. (*Heyzer* v. *Morris,* 110 App. Div. 313 ; *Phillips* v. *Phillips,* 77 App. Div. 113 ; *Ivison* v. *Ivison,* 80 App. Div. 599 ; *Dobie* v. *Armstrong,* 160 N. Y. 584 ; Code Civ. Pro. § 1003 ; *Haughian* v. *Conlan,* 86 App. Div. 290 ; *Katz* v. *Schnaier,* 87 Hun, 343 ; *Cook* v. *White,* 43 App. Div. 388 ; 167 N. Y. 588.)

*Edgar L. Fursman* and *W. H. Van Schoonhoven* for Samaritan Hospital, respondent. The trial court was correct

in refusing to submit the case to the jury. (*Dobie* v. *Armstrong*, 160 N. Y. 584; *Ivison* v. *Ivison*, 80 App. Div. 599; *Haughian* v. *Conlan*, 86 App Div. 291.) Suicide does not raise even a presumption of insanity. (*Weed* v. *M. B. Ins. Co.*, 70 N. Y. 561; *Matter of Card*, 28 N. Y. S. R. 528.) The rulings of the trial court upon questions concerning the admissibility of evidence were in all respects correct. (Code Civ. Pro. § 829; *Eckert* v. *Eckert*, 13 App. Div. 490; *Sanford* v. *Ellithorp*, 95 N. Y. 48; *Johnson* v. *Cochran*, 91 Hun, 165; *Steele* v. *Ward*, 30 Hun, 558; *People* v. *Koerner*, 154 N. Y. 25; *Hoey* v. *Hoey*, 53 App. Div. 208; *Ivison* v. *Ivison*, 80 App. Div. 599, 602; *Matter of Keidaisch*, 13 N. Y. Supp. 255; *Delafield* v. *Parish*, 25 N. Y. 9; *Matter of Donohue*, 97 App. Div. 210.)

*Charles E. Patterson* for Isabella K. Lombard, respondent. There was no error in the exclusion of the evidence of Drs. Ferguson and King. (*Cudney* v. *Cudney*, 68 N. Y. 148; *Marx* v. *McGlynn*, 88 N. Y. 357; *Matter of Myer*, 184 N. Y. 54.)

Willard Bartlett, J. This is an action by an executor under section 2653a of the Code of Civil Procedure to establish the validity of the probate of a will. The testator was Henry T. Nason, of Troy, who died on the 30th day of March, 1903, under circumstances which indicated that he must have taken his own life. At the time of his death the testator was county judge of Rensselaer county, having just entered upon his second term of service in that office, to which he was re-elected at the general election in November, 1902.

The instruments propounded for probate and proved in the Surrogate's Court were a will executed on November 12, 1902, and a codicil executed on March 28, 1903. By the will all the property of the testator was devised and bequeathed to his mother provided that she should be alive at the time of his decease. There were gifts over to take effect only in the event that his mother should not be alive at the time

of his death to Mrs. Isabella K. Lombard, a friend of the
testator, to his physician, to his former law partner, to his
clerk, to several servants and to the Samaritan Hospital in
Troy, with a bequest and devise of the balance of the estate
to the testator's grandfather, Martin I. Townsend. The will
further provided for an increase in the amount of the specific
legacies in case neither the testator's mother nor his said
grandfather should survive him. The testator's mother was
appointed executrix in case she should survive him, otherwise
he nominated William J. Roche, of Troy, to be the sole
executor.

The testator's mother died intermediate the execution of
the will and the codicil. The codicil modified the will only to
the extent of making several specific gifts of personal prop-
erty to certain corporations and persons mentioned therein.

Judge Nason was in his thirty-eighth year at the time of
his death. He had been a member of the bar for about four-
teen years, and had practiced his profession until he became
county judge of Rensselaer county. He was a man of educa-
tion and refinement, and appears to have been more than
usually kind and gentle in his bearing and demeanor. No sug-
gestion is made that he had not administered the duties of his
office well and acceptably to the legal profession and to the
public. There does not appear to have been any manifes-
tation of lack of ability or even of eccentricity in the per-
formance of his work as a judge. His family and household
consisted of his widowed mother and his grandfather, Martin
I. Townsend. He was the only child of his parents, he had
never married and he had no relatives other than his mother
and grandfather nearer than second cousins. It may fairly
be assumed that these other relatives had no special claim
upon his bounty, inasmuch as it was expressly admitted upon
the trial that all the defendants in this action were in good
financial condition.

On April 16, 1902, Judge Nason with the acquiescence
of his physician, Dr. Everard D. Ferguson of Troy, went
to the Glen Spring Sanitarium at Watkins, N. Y., a health

resort then under the charge of Dr. James E. King. He remained there until the 25th day of July in the same year. His mother was at Watkins with him during a portion of this period. I shall assume, for reasons to be stated hereafter, that Judge Nason was suffering at this time from some form of neurasthenia — the malady commonly known as nervous prostration or nervous exhaustion. On his return to Troy he resumed his judicial duties and his usual course of life at home, without indicating, so far as the evidence discloses, any serious physical disability or any lack of mental power or comprehension. There is no intimation that at the time of the execution of the will in November, 1902, or at the time of the execution of the codicil, two days before his death in March, 1903, anything was observed in his conduct to justify the inference of want of testamentary capacity on either occasion.

There are forty-three defendants in the action. Eleven answers were interposed. Four of these were in behalf of infants and four others admitted the validity of the probate of the will and codicil. In one of the remaining three answers there was merely a general denial of the allegations of the complaint while two of them, in addition to a general denial, set up four affirmative defenses as follows : (1) Lack of testamentary capacity ; (2) undue influence ; (3) that the testator at the time of the execution of the will and codicil was afflicted with a suicidal mania which entered into and formed a part of the testamentary disposition attempted by those instruments ; and (4) that there was a failure to prove in the Surrogate's Court the identity of the instruments as duplicates.

The plaintiff made out a *prima facie* case under section 2653a of the Code of Civil Procedure, by putting in evidence the record of the probate proceedings in the Surrogate's Court. He also put in the will and codicil which had been admitted to probate. I will consider the affirmative defenses and the evidence offered in support of each but in a different order from that in which they are set up in the answers.

The will purports on its face to have been executed in

duplicate; so does the codicil. Hence, the appellants contend that it was incumbent upon the plaintiff to establish by proof that the alleged duplicates were in fact duplicates, and they further insist that it should have been left to the jury to say: "Was there any identification of duplicates as such, or identification of which instrument it was that the testator published for his will?"

Where a will is executed in duplicate this court has declared that there can be no conceivable reason for proving both instruments or having both admitted to probate. "The proponents of either duplicate can undoubtedly be required to produce the other, so that both may be before the court for inspection, that it may be seen whether they are precisely alike, or whether there has been any revocation. But when it appears that they are alike and that there has been no revocation, then it would be quite an idle ceremony to prove both, or to admit both to probate." (*Crossman* v. *Crossman*, 95 N. Y. 145, 150.) In the case of the will and the codicil here, only one of the duplicate instruments was proved in the Surrogate's Court and received in evidence upon the trial of the present action, but the plaintiff sought to introduce the other duplicate will and codicil, in strict accordance with the practice approved in the *Crossman* case. The contesting defendants, however, interposed an objection, and thereupon the papers were withdrawn by plaintiff's counsel. Under these circumstances, the contesting defendants are in no position to insist that the proof is insufficient to establish the identity of the alleged duplicates, for the contention is inconsistent with their own objection. The instruments were produced in court open for their inspection and it is not to be supposed that competent counsel, if there was the slightest reason to believe that they did not correspond with the probated will and codicil, would have objected to their introduction. As the proof stood there was clearly no question for the jury on this branch of the case.

The next proposition which I will discuss is the assertion on the part of the contesting defendants that if either the

will or codicil was made with an intent on the part of the decedent to take his own life, the instrument executed with such intent is void as against public policy.

It seems a sufficient answer to this proposition that the record discloses no evidence to warrant the inference that either instrument was drawn up or executed with suicidal intent.

The mere fact that the testator came to his death by his own hand within a few days after he executed the codicil does not justify such an inference. We may guess or surmise that the testator contemplated suicide, but it is a matter of pure speculation in the face of an equally strong probability that the thought of self-destruction never entered his mind until after the execution of the instrument.

In this view of the facts it is not necessary to declare what would be the effect of a testamentary disposition made with suicidal intent; but attention may properly be called to the radical distinction which exists between such a case and the case of *Riggs* v. *Palmer* (115 N. Y. 513), cited in behalf of the appellants. There the beneficiary under a will murdered his testator; and it was held that he could not take either under the will or as next of kin, the court applying the principle that the law will permit no man to acquire property as the result of his own crime. No such principle is applicable to the case of one who is actuated by an intention to commit suicide in making his will. It is true he intends to commit what the law of this state denominates a grave public wrong (Penal Code, section 173), and an act universally condemned in the domain of Christian morals, but the fact that he executes a will with this sin in contemplation does not necessarily imply any wrongdoing to be effected by his will. He disposes of his property after death as he might dispose of it during his lifetime. He acquires no benefit to himself nor does he confer any benefit upon others which he might not bestow with an entire absence of suicidal intent; so that it is difficult to perceive how such intent, however reprehensible, can invalidate a testamentary disposition of property which is otherwise unobjectionable in law.

As to the alleged lack of testamentary capacity, it will be observed that this defense finds no support in the facts which have already been stated in regard to the testator's character, life and conduct. It is contended, however, that the record contains proof of other facts which required the submission of this issue to the jury. Evidence of these facts is found largely in the written statement of Henry N. Magill, an intimate friend of the testator, whose unverified statement was received as proof in the absence of the witness by consent of counsel. In this statement it is asserted that the father and grandmother of the testator were both afflicted with mental trouble; that his father was for some time at an asylum near Boston, and that when his grandmother was insane he was the only person who had any influence with her. From this testimony it certainly might be inferred that insanity had been manifested in the ancestry of the testator; but this proof would not properly lead to any inference of mental unsoundness on his part in the entire absence of evidence tending to show any manifestations of mental derangement during his life of thirty-seven years.

Mental derangement cannot be predicated solely upon the circumstance that he killed himself. Insanity is not inferable from the mere act of suicide. (*Weed* v. *Mutual Benefit Life Ins. Co.*, 70 N. Y. 561; *Shipman* v. *Protected Home Circle*, 174 N. Y. 398, 405.) Nor does the fact that a man has taken his own life, alone and of itself and in the absence of any other evidence as to his mental condition, warrant the deduction that his mind was unsound at the time of the suicidal act, or prior thereto, or that he lacked testamentary capacity, for, as was pointed out by WERNER, J., in the case last cited, human experience has often shown that sane men have taken their own lives.

If the view which has been taken of the evidence is correct there was no question to submit to the jury upon the issue of testamentary capacity, and the learned trial court was right in refusing to submit that question unless some material error was committed in the rulings upon the trial.

The record contains twenty-eight exceptions by the contesting defendants to rulings of the trial court upon evidence. Most of these are so obviously correct as not to require specific notice. A few of them, however, demand discussion.

One of the witnesses called by the contesting defendants was Dr. James K. King, the physician-in-chief of the Glen Springs Sanitarium at Watkins, N. Y., where Judge Nason was a patient under the care of the witness from April 16th, 1902, until the 25th of July in the same year. He was asked "What was Judge Nason's condition, physically and mentally, when he arrived at the sanitarium?" The question was objected to on the ground that the witness was incompetent, under section 834 of the Code of Civil Procedure, relative to privileged communications to medical practitioners. The objection was sustained, notwithstanding that the provisions of the section had been expressly waived by the contesting defendants, and they duly excepted. Exceptions were also taken to rulings which sustained objections to questions put to Dr. King as to what was the physical condition of Judge Nason when he arrievd at the sanitarium, and whether he was treated there for any physical ailment, and the contesting defendants further excepted to the action of the learned trial judge in striking out a statement of the same witness that Judge Nason was treated at the sanitarium for a neurasthenic affection.

In view of the waiver I am of the opinion that this physician might well have been permitted to testify concerning the matters in regard to which he was thus interrogated, and that his testimony to the effect that Judge Nason was treated at the institution for a neurasthenic affection ought to have been allowed to stand. It is manifest, however, that the rulings did no harm to the contesting defendants. Had they been in favor of the appellants it is plain from the whole body of evidence actually received that the utmost which could have been established by the testimony of Dr. King was that while Judge Nason was his patient at Watkins he was suffering from neurasthenia. The character of this malady and its symptoms were fully set forth by Dr. H. L. Waldo, of Troy, an expert

witness called 'by the contesting defendants, who defined neurasthenia to be nerve exhaustion and declared that it was not necessarily accompanied by any delusion.   When asked to state the principal symptons of neurasthenia, he answered as follows : " General nervousness, sleeplessness and very often morbid fears ; patients are often afraid to be alone, afraid to walk alone, afraid buildings will tumble upon them or afraid they will do something they ought not to do ; often afraid they will become insane, and frequently have symptoms refer- able to different organs of the body; very frequently they have heart disease ; very frequently they may become insane. It variously affects their capacity to attend to business.   Many neurasthenics can attend to business pretty well.   I should hardly think in uncomplicated neurasthenia any suicidal ten- dency is developed."   Assuming the existence of neurasthenia in the case of Judge Nason when he went to Watkins in the spring of 1902, there is no evidence that he manifested any serious symptoms of that affection after he left the sanitarium in July, 1902, up to the time of his death in the spring of 1903. He held court and administered the duties of his office as county judge of Rensselaer county thereafter, under condi- tions which must have subjected him constantly to public observation and the critical scrutiny of members of the bar ; he was himself a candidate for re-election in November, 1902 ; and yet there is no suggestion or intimation anywhere in this record that he exhibited any physical or mental incapacity during this period, in the slightest degree, unless such manifes- tations are to be found in the fact that he took some tonic medi- cine and medicine to overcome insomnia from the trained nurse who was caring for his mother during her last illness, or in the further fact that he was distressed in mind by the idea that his mother's sickness and death had been in some manner induced by the affectionate care she had bestowed upon him.   It seems to me that the jury would have been utterly unwarranted in hold- ing that either of these facts tended to show a lack of testament- ary capacity on the part of this man, either at the time when he executed the will or at the time when he executed the codicil.

The contesting defendants also called as a witness Dr. Everard D. Ferguson, of Troy, who was the medical attendant of Judge Nason, and who testified that he allowed the judge to go to Glen Spring Sanitarium at Watkins, N. Y., in the spring of 1902. When asked for what reason he did this the question was objected to, the objection was sustained and the contesting defendants excepted. Exception was also taken to a ruling sustaining an objection to an inquiry of the same witness as to what Judge Nason said to him concerning his own health, at the time of his mother's illness. Both these rulings were correct. The question as to the reasons which influenced Dr. Ferguson in permitting his patient to go to Watkins called merely for a statement of the operation of the mind of the witness, which could hardly be material, and what Judge Nason himself *said* to the doctor about his health could not be evidence of the fact that the condition of his health was as stated. If the purpose of the inquiry was to show that Judge Nason had made some irrational statement on the subject, that purpose should have been disclosed by counsel conducting the examination, inasmuch as the form of the question did not suggest that such was the object in view.

In respect to the allegation of undue influence it is necessary to say little more than that it was wholly unsupported by the proof. As has already been pointed out, none of the surviving next of kin of the testator were in such pecuniary circumstances as to require assistance from him, or as to be entitled naturally to regard themselves as likely to be the recipients of any part of his estate. He left his property to warm personal friends and associates and charitable corporations in which he had taken much interest in his lifetime. Under all the circumstances this seems to have been a perfectly natural disposition to make of his estate; and while undoubtedly some of the legatees enjoyed the same opportunity which any man's intimate friends enjoy to endeavor to influence him in reference to the testamentary disposition of his property, had they been so disposed, there is not the slightest indication that they ever availed themselves of such opportunity.

As the case was devoid of evidence tending to establish the contention of the appellants upon any of the issues involved, it was proper to direct a verdict sustaining the will. (*Dobie v. Armstrong*, 160 N. Y. 584.) The judgment was right and should be affirmed, with costs.

Cullen, Ch. J., Gray, Edward T. Bartlett, Haight and Vann, JJ., concur; Chase, J., not sitting.

Judgment affirmed.