## SECOND DEPARTMENT, FEBRUARY, 1923.

HELEN O'REILLY, Appellant, v. THE CITY OF NEW YORK, Respondent.

NELLIE ANGLIN, Appellant, v. THE CITY OF NEW YORK, Respondent.

*Municipal corporations — city of New York — negligence — nuisance — action by passenger of bus line to recover for personal injuries — dismissal of complaint — when proper — defense of ultra vires not pleaded — statutes regulating operation of bus lines — franchises.*

Appeal in each of the above-entitled actions by the respective plaintiffs, from a judgment of the Supreme Court in each action in favor of the defendant, entered in the office of the clerk of the county of Richmond on the 2d day of March, 1922, upon the dismissal of the complaint by direction of the court at the close of the plaintiff's case, and also from an order in each action, entered on the 3d day of February, 1922, denying the plaintiff's motion for a new trial made upon the minutes.

In each action: Judgment and order affirmed, with costs. No opinion. Kelly, P. J., Rich and Young, JJ., concur; Kelby, J., dissents and reads for reversal on the cause of action for nuisance; Jaycox, J., dissents as to both causes of action.

KELBY, J. (dissenting): In so far as the majority of the court affirms the judg-

ments dismissing the complaints at the end of the plaintiffs' case on the first cause of action, as to negligence, I concur because of the failure to show that the driver who was operating the bus at the time of the accident was in the employ of the city of New York. I dissent from the conclusion of the court as to the second cause of action, which is for the maintenance of a nuisance. This accident happened in July, 1920. Prior to that time, and on June 11, 1920, the Court of Appeals, in the case of *Brooklyn City Railroad Co.* v. *Whalen* (229 N. Y. 570), affirmed the decision of this court, made at the May term, 1920 [191 App. Div. 737], holding that there was no authority in the city of New York to allow the operation of bus lines within the limits of the city except in accordance with the provisions of the city charter. Sections 73 and 74 of the charter of the city of New York* prescribe the method by which a local franchise may be granted for the use of any street, avenue, etc., of the city. These provisions are in many of their terms a re-enactment of the old Cantor Act.† The Cantor Act was passed for the purpose of avoiding in the future, grants similar to those made by the so-called " boodle board of aldermen," which, at the instance of one Jacob Sharp, granted franchises for the use of Broadway for street car purposes.‡ The Cantor Act was supplemented by other legislation, part of which is found in the Transportation Law of the State, which requires a certificate of convenience and necessity from the Public Service Commission for the operation of a bus line.§ In addition to these provisions section 1458 of the city charter¶ contains the express prohibition that " No stage or omnibus route or routes for public use, or any alteration or extension thereof, or any alteration or extension of any existing stage or omnibus route, shall hereafter be put in operation in or upon any street, avenue, park, parkway, bridge or public ground within the city of New York until and unless a franchise or right therefor shall be obtained from the board of estimate and apportionment in like manner as, and subject to the limitations and conditions relating to, franchises or rights in this charter provided and imposed." In spite of these plain statutory provisions, the board of estimate and apportionment, on January 16, 1920, passed the following resolution: " Resolved: That the Commissioner of Plant and Structures be and he is hereby granted permission to operate or to regulate and supervise the operation of motor vehicles for the purpose of carrying passengers until March 31st, 1920, over or through such routes as may be necessary to provide service for the inconvenienced public of the Borough of Richmond by the cessation or discontinuance of the operation of any line or portion thereof of the Staten Island Midland Railway Company, for a five cent fare, and to use

* See Greater New York Charter (Laws of 1901, chap. 466), § 73, as amd. by Laws of 1905, chap. 629; Id. § 74, as added by Laws of 1914, chap. 467.— [REP.

† See Laws of 1886, chap. 65, as amd. by Laws of 1886, chap. 642, as amd.— [REP.

‡ See *People* v. *Sharp* (107 N. Y. 427).— [REP.

§ See Transportation Corporations Law, § 25, added by Laws of 1913, chap. 495, as amd. by Laws of 1915, chap. 667; Id. § 26, added by Laws of 1915, chap. 667, as amd. by Laws of 1919, chap. 307. See, also, Pub. Serv. Comm. Law, § 53, as amd. by Laws of 1921, chap. 134; Id. §§ 4a, 5a, as added by Laws of 1921, chap. 134, transferring said power and jurisdiction to the Transit Commission. See Laws of 1921, chap. 335, amdg. said § 5a.—[REP.

¶ Added by Laws of 1913, chap. 769.— [REP.

the staff of the Department of Plant and Structures in so far as it may be necessary to carry out the purpose of this resolution." Pursuant to the powers thus given to the commissioner of plant and structures, regulations for the operation of buses were made, and various privately owned buses, bearing signs " City of New York, Department of Plant and Structures," proceeded to operate in Staten Island over routes established by the commissioner. The buses also bore the sign " Fare 5c," surrounded by the inscription " City of New York, Dep't of Plant & Structures." It appears from the record that the alleged authority for the maintenance of these buses was predicated solely upon the foregoing resolution, and that " the authority was from time to time renewed for short periods " until the cessation of the bus operation in August, 1920. The record also shows that in some instances written permits to operate over the bus routes were given by the department of plant and structures, and that in other cases oral permission was given. Employees of that department were delegated to work as starters and as supervisors; the latter establishing routes over which the buses were operated, in conformance with the orders of the commissioner. Printed regulations for the operation of buses were distributed and enforced by the commissioner. That official, on July 22, 1920, in a written communication, directed the " chief bus supervisor " to dismiss from further service any chauffeur or owner of a bus found guilty of reckless driving or speeding. If a chauffeur disobeyed the regulations the oral or written permit theretofore granted to the owner of the bus was revoked. This court has held in *People ex rel. Judge* v. *Hylan* (200 App. Div. 430) that the operation of bus lines on the streets was a public nuisance and beyond the power of the local authorities unless a franchise had been granted pursuant to the terms of the charter. The city of New York, therefore, through the acts of its agents, established a public nuisance by granting to various bus owners the power so to use the streets over regular routes. It has also undertaken, through its agents, to spend the public money in supervising the operation of such nuisance. What in fact was done was to turn over the use of the public streets to private parties for the purpose of private business and for private gain. In *Cohen* v. *Mayor, etc.* (113 N. Y. 532) the municipal authorities of the city of New York, in direct violation of the statute,* assumed to grant to a private individual the right to the use of one of its streets while the said individual was in the transaction of his private business. In that case a grocer was granted permission to keep his wagon, when not in use, in the street, in front of his store. The city also undertook to exact an annual license fee for the maintenance of the nuisance. While the wagon was so standing in the street the thills were raised perpendicularly and held by strings. A passing ice wagon struck the grocery wagon and turned it partially around, the strings broke, and the thills came down upon the sidewalk, striking the plaintiff's intestate in that case and killing him. The Court of Appeals held that the storing of the wagon in the street was a public nuisance, and that the defendant, by licensing it, made itself liable for any damages resulting therefrom, the same as if it had itself maintained the nuisance. And this in spite of the fact that a third agency intervened by the driver of the ice wagon carelessly driving into the standing wagon although the rest of the street was clear. In *Wells* v. *City of Brooklyn* (9 App. Div. 61; appeal dismissed, 158 N. Y. 699) this court held the city liable, on the theory of a nuisance, for

* See Laws of 1873, chap. 335, § 17, subd. 4.— [REP.

personal injuries caused by the fall of a show case maintained on a sidewalk for years without permission of the city authorities, although the structure was not actually dangerous in the first instance or manifestly likely thereafter to become so. There are other cases, like *Speir* v. *City of Brooklyn* (139 N. Y. 6) and *Landau* v. *City of New York* (180 id. 48), where people using a highway for ordinary purposes were injured by reason of the discharge of fireworks allowed to be displayed by the city authorities. In those cases also, under the facts, the city was held liable. In *Scanlon* v. *Wedger* (156 Mass. 462) the plaintiff was a spectator at an exhibition of fireworks authorized by the municipality. It was there held that as the plaintiff was a voluntary spectator, present for the purpose merely of witnessing the display, he necessarily consented to it, and that he suffered no legal wrong if accidentally injured without negligence on the part of any one, although the show was unauthorized. The court, however, in that case said: " If an ordinary traveller upon the highway had been injured, different reasons would be applicable." The doctrine laid down in *Scanlon* v. *Wedger* has been adopted by our Court of Appeals in two cases (*Johnson* v. *City of New York*, 186 N. Y. 139, and *Bogart* v. *City of New York*, 200 id. 379). Both of these cases arose out of the same accident and out of the same transaction of the city. On May 31, 1902, the Automobile Club of America held automobile races or speed trials on Staten Island, on the Southside boulevard. They were held pursuant to a resolution of the board of aldermen of the city of New York which read in part as follows: " That upon the recommendation of the local board, First district, borough of Richmond, permission be and the same is hereby given to the Automobile Club of America to conduct speed trials for automobiles on the Southside boulevard in the fourth ward of the borough of Richmond on Saturday, May 31, 1902, between the hours of eleven o'clock A. M. and four o'clock P. M." Elaborate preparations were made for the care of people attending the races, more than 100 policemen being specially detailed to patrol the boulevard during the hours in which the races were to be run. In both cases it was held that the resolution above quoted was illegal and void. In the *Bogart* case (at p. 381) the court, quoting from *Johnson* v. *City of New York* (*supra*), said: " But granting that the action of the defendants in the use of the highway was illegal, the question remains, was it illegal against the plaintiff so as to render the parties participating therein liable to her solely by reason of the illegality of their acts and regardless of any element of negligence or other misconduct. *If the plaintiff had been a traveler on the highway when she met with injury a very different question would be presented.* Highways are constructed for public travel, and, as already said, the acts of the defendants were doubtless an illegal interference with the rights of the traveler." The court, in the *Bogart* case, continuing, said: " But the plaintiff was in no such situation. She was not even a casual spectator whose attention was drawn to the race while she was traveling in the vicinity. She went from her home, a distance of five miles from the scene of the race, expressly to witness it and to enjoy the pleasure that the contest offered. As to the elements which made the contest illegal, she was aware of their existence." Further on in the opinion (at p. 382) the court said: " It may be assumed that the defendant is liable to the plaintiff for any injuries to her arising from the illegal use of the highway, if her intestate was injured while using the highway as a traveler. If, however, the intestate was injured while a spectator in attendance at the races

to witness them and enjoy the pleasure that the contest afforded, the plaintiff is not entitled to recover and the judgment should be reversed." The defendant endeavors to characterize the plaintiff, who was hurt while in the bus, as a person who when injured " was not using the highway as a traveler." If she was not a traveler on the highway, apparently she has no cause of action. It seems clear that in the *Johnson* and *Bogart Cases* (*supra*) the plaintiffs apparently abandoned the use of the highway for highway purposes and become voluntary spectators at an exhibition conducted in the highway. Both plaintiff and defendant in these cases were using the highway for purposes of entertainment. In the case at bar there was no abandonment by the plaintiff of the highway for highway purposes. People make lawful use of the highway by walking upon it or by riding upon it in trolley cars, automobiles, carriages or buses. The plaintiff was invited to take the bus by the defendant, the city of New York, by reason of the signs placed thereon, which led her to believe that it was operated by the city of New York and for a five-cent fare. In the absence of any other evidence, these signs alone raised the presumption that the bus was being operated by the city itself. It seems to me that this is the real crux of the case. When the city undertook to give various private bus owners the right to use the public streets for private business, and to supervise the illegal business thus permitted, it might reasonably have been anticipated that in the ordinary course of events people would be injured. By this it is not meant to characterize an automobile or an automobile bus as a dangerous agency. It is, however, maintained that as a matter of common knowledge people are injured almost daily by automobiles, taxicabs and buses as an incident to congested travel in public thoroughfares. Apparently it appears to be conceded by the majority of the court that if the plaintiff had been walking on the highway and the bus had run her down and injured her, the defendant might be liable. How her status was changed by the fact that she rode to business in the bus instead of walking on the highway or riding in another conveyance, it is difficult to see. The defendant, the city of New York, has the power, after certain provisions of the statute have been complied with, to issue legal consents or franchises for bus lines. While that part of the resolution which undertook to give the city itself power to operate buses was clearly illegal and beyond the power of any of its officers to pass, the remaining part of it, which authorized the granting of permission and provided for supervision, may have been within its corporate powers. It, therefore, seems that if the city wished to urge that the resolution of the board of estimate and apportionment and the acts done pursuant thereto were beyond the scope of the defendant corporation, it was under a duty to plead the affirmative defense of *ultra vires*. In *Richmond County Society P. C. C.* v. *City of N. Y.* (73 App. Div. 610) and *Stanton* v. *Erie Railroad Co.* (131 id. 879, 881) it was held that *ultra vires* was an affirmative defense which must be pleaded. If the plea of *ultra vires* was before the court, it might well be held that the city was free from liability, and that its officers who acted beyond their authority in creating the nuisance would be individually liable therefor. This court must interpret the law as it finds it. However desirable the operation of bus lines may be, the city has no power to authorize it except in obedience to the limitations contained in the charter and the statutes. I, therefore, vote to reverse the judgments appealed from and to send the cases back for a new trial on the cause of action for the maintenance of a nuisance.