In the Matter of the Claim of ROSARIO APONTE, Respondent, against SANTIAGO & GARCIA et al., Appellants. WORKMEN'S COMPENSATION BOARD, Respondent.

Third Department, January 9, 1952.

*Philip J. Caputo* for appellants.

*Nathaniel L. Goldstein, Attorney-General (Daniel Polansky* and *Roy Wiedersum* of counsel), for Workmen's Compensation Board, respondent.

*Reisman, Cohen & Milberg* for claimant-respondent.

BERGAN, J. On October 7, 1945, Pasquale Aponte was found unconscious in bed in his apartment where he lived alone. In the kitchen of the apartment which was separated from the bedroom by a living room was a gas stove. Two burners of the oven were turned on from which unlighted gas was escaping. Three burners on the top of the stove were not turned on. The windows were closed. The next day he died of gas poisoning.

The Workmen's Compensation Board has found that the death was the result of an industrial accident. It held that the death from gas poisoning was suicide and that the suicide was caused by a fall down a stairs in his employer's restaurant September 22, 1945. We examine the record brought to us to inquire if there is substantial evidence to connect the two events.

The hospital records suggest that the injury of September 22d was, after the first day, not regarded by the physicians who treated him, as severe. He was placed on the '' serious '' list the first day, but a spinal tap then taken was negative, and X-ray examination showed that he had no fracture of the bony parts of the ribs. His chest was strapped.

The recorded course of treatment indicates he was on regular diet on all but two of the seven days he was at the hospital and that he slept well or fairly well throughout his stay. He was discharged on September 29th with the notation by the physician who discharged him that '' no fracture seen on X-ray — feels fine ''. Nothing in the record suggests that any physician then felt any further treatment was indicated and medical testimony supplementing the record is in the same direction.

Ramona Toro, the woman with whom decedent boarded before the accident, and whose apartment he took over to live alone after his discharge from the hospital, testified to her observations of his condition. She rode with him in the ambulance to the hospital and testified that decedent then told her he was in pain and that he '' was going to die ''; that '' right after '' the accident he told her he could not live with the pain and asked '' What's the use of living.''

She testified that he '' was in the same condition '' after his discharge from the hospital '' as when he went into the hospital.'' She said she saw him '' pulling his hair '' and '' trying to take his shirt off '', but except for a previous identification of '' right after the accident '' the time of this is indefinite. She testified she brought food to his apartment and otherwise took care of him; that the night before he was found suffering from gas poisoning he '' was crying like a baby and despairing of

himself  *  *  *  He said that that pain had got him so that he would like to kill himself ''.

Lola Fiorella, a neighbor in the apartment house, testified that while decedent was in the hospital he expressed to her the thought he would be crippled and unable to work; that after he left the hospital he complained of pain in the chest and said he was sorry he had left the hospital and wanted to go back and that she agreed to take him back.

Decedent's employer, Santiago Garcia, testified that when he saw him at the hospital after the accident he " was like most dead " and wanted to die. Another neighbor in the apartment house, Joseph Osiria, testified that after decedent came out of the hospital he said he thought he could not work any more; that he had a great deal of pain and that he thought it was a very tough life.

The record, however, shows without dispute that decedent moved about considerably before the night that he suffered the gas poisoning. The employer Garcia testified that decedent had visited his place of business after the accident. There is proof that he visited the physician for the carrier at the carrier's office 57 Gold Street, a long distance away from his apartment on October 1st, two days after his discharge from the hospital. The only " complaint " then noted by the examining physician was a pain in the left chest where adhesive strapping was observed.

The physician felt there was a contusion of the ribs and possible fractures, although he seems not then to have known the result of the negative hospital X ray in this respect because he advised an X ray. He felt decedent could return to light work in two weeks. Miss Fiorella testified that on another occasion the decedent visited her mother's apartment in the same building after his return from the hospital.

On the night before the gas exposure, a Saturday night, Mr. Osiria testified that decedent came downstairs to make sure that Miss Fiorella, Mr. Osiria's sister-in-law, would take him back to the hospital on Monday. The witness said: " He wanted to be sure that she be here for next Monday when he was going to the hospital; she was going to take him to the hospital." Decedent was then fully dressed, and the witness said he did not know whether he had come from his apartment upstairs " or the street."

In evaluating the question of whether decedent's death was suicide or accident the board met not only the strong presumption which the law, in consonance with general human experi-

ence, invokes against an act of self-destruction and in favor of a desire for the continuance of life, but also with a specific statutory presumption created by subdivision 3 of section 21 of the Workmen's Compensation Law that the injury was not due to the " willful intention " of the employee to " bring about the * * * death of himself ".

Where the cause of death could be either suicide or accident, the presumption is that it is accident. (31 C. J. S., Evidence, § 135, p. 776.) Where, for instance, a man was found dying from the inhalation of illuminating gas flowing from an unlighted jet in his bedroom, Judge LEHMAN, then sitting in Appellate Term, was of the opinion in *Herschkowitz* v. *Mutual Life Ins. Co.* (93 Misc. 522) that in such equivocal circumstances a verdict should be directed against the insurance company's defense based on suicide, although, in that case, evidence which would be relevant on the issue was thought improperly excluded and a new trial was ordered.

The settled rule of law in New York is that if the cause of death is open to equal inferences the presumption is against suicide. A good synthesis was made for the Court of Appeals in 1871 by GROVER, J., in *Mallory* v. *Travelers' Ins. Co.* (47 N. Y. 52, 54–55) : " From the facts above stated, it appeared either that the death was caused by such an injury or the suicidal act of the deceased; but the presumption is against the latter. It is contrary to the general conduct of mankind; it shows gross moral turpitude in a sane person."

Cases which illustrate the operation of this presumption against a background of facts from which either suicide or accident could almost equally be deduced are : *Weil* v. *Globe Ind. Co.* (179 App. Div. 166) ; *Landon* v. *Preferred Accident Ins. Co.* (43 App. Div. 487), and *Mandi* v. *Metropolitan Life Ins. Co.* (143 Misc. 771).

But the case before us is not one of merely equivocal proof which rests heavily on a presumption. The proof intrinsic to the death itself points to an accident and not to a suicide and thus reinforces the presumption rather than depends upon it.

No one who, in one official capacity or another, went into the apartment at the time decedent was found, gained any impression that this was a suicide. The emergency service employee of the utility company who found the decedent, shut off the gas, applied inhalator treatment and called the police, reported in the terms of a company record: " Looks as if using oven to heat apartment."

The utility company record also contained the notation that " oven and broiler on for heat not lit ". The official police report discloses the notation " 2 burners of kitchen gas range turned on accidently extinguished." All this may fall something short of direct proof of these conclusions, but it does reflect the judgment of experienced men on the scene whose duty it was to investigate causation.

Nothing the decedent himself did in the course of his conduct previous to his death suggests he was intent on his own self-destruction. He had lived all his life in a tropical climate in Puerto Rico. He had come for the first time to New York in early September, a few weeks before his accident. The proof is that the heat in decedent's apartment was not yet turned on on October 7th.

The Weather Bureau record shows a minimum temperature of 56 degrees on that day. It had been colder earlier in the week. A policeman who investigated the case testified " it was cool and it had been cool the night before," and he defined what he meant by " cool " by saying that " it means that I am uncomfortable, I mean that it is cold enough that you put a little say heavier clothing on."

To light a gas oven in such circumstances would, at least, be a rational act. A man, intent on self-destruction by gas would not take the trouble to turn on two burners in the oven of the stove, and leave untouched the three more accessible burners on the top of the stove. Nor would such a man, instead of remaining in the room where the gas was escaping, walk into a bedroom, the most remote room from the kitchen in the apartment, undress and retire to bed.

The policeman, in view of the cool temperature said that in the police investigation " we did not think it too funny to have gas on in the apartment, I mean we did not think anything was wrong on it ", a conclusion which the referee struck out, although the referee also found after hearing the evidence that the death was not a suicide. This was reversed by the board to reach its own finding that it was suicide.

The board could, of course, have found that decedent had pain and was discouraged and despondent over his physical condition after the accident. It could have found that he told Ramona Toro on October 6th that the pain had " got him so " he " would like " to kill himself. But the hospital record, impartial, undisputed and contemporaneous shows good progress in a relatively minor injury and it is undisputed that

decedent moved about considerably after he was discharged from the hospital.

The decedent discussed with two witnesses his intention of returning to the hospital the following Monday. This discloses the mind of a man planning, not for death, but for life. Thus the board was confronted with a record on the question of intent and motive which was, to give it every bit of weight in the direction in which the board found, still equivocal. With such balance and with the intrinsic facts in the death itself strengthening rather than weakening the presumption against suicide, we think the board had no substantial evidence upon which to erect its finding that decedent died by an act of self-destruction.

Assuming, however, that the board was at liberty to find from this record that there was a suicide, there remains a wide and unbridged gap between this and any substantial evidence upon which such a suicide could be attributed to the industrial accident to which it has been charged.

It is the New York rule that to attribute a suicide to an industrial accident the suicide must be shown to result from a " brain derangement " in the nature of a disease, which in turn has been the result of the accident. (*Matter of Delinousha* v. *National Biscuit Co.*, 248 N. Y. 93.) It is not enough that discouragement over the accident or melancholy or " other sane conditions " lead to the suicide (p. 96).

This court in 1949 reversed an award for death benefits arising from suicide where it was shown the decedent had become " nervous " and " depressed " by reason of an accident but it was not shown he had a mental derangement in the nature of a disease. (*Matter of Wessells* v. *Lockport Cotton Batting Co.*, 275 App. Div. 873.) Awards which have been sustained have all been based on a showing of mental illness leading to the suicide and caused by the accident.

Two examples are *Matter of Pushkarowitz* v. *Kramer* (275 App. Div. 875, affd. 300 N. Y. 637), where decedent sustained a head injury leading to a depressive psychosis which caused his suicide, and *Matter of Lockwood* v. *Luckey Platt & Co.* (267 App. Div. 930), where a fall in which there was a head injury led to a traumatic psychosis and changes in brain function and as a result of this there was a suicide. *Matter of Ribaudo* v. *National Worsted Mills* (252 App. Div. 902) is in a class apart, for there it could be and was found that the original injury, as well as a fall from a window was a direct cause of death.

No reported case in New York has advanced so far the frontier of compensation liability for suicide as the case that is now here. After the board, reversing the referee, found that the decedent's death was due to suicide it restored the case to the calendar for the development of the record on the issue of the causal relationship between the accident and the death.

A psychiatrist was called and asked to assume, not only facts as testified to by the witnesses, but also that decedent " took his life ", and " ended his life ", and " committed suicide ". The physician was required to weigh into his evaluation and to assume as an actual fact a matter resting on the merest inference and on the opinion of the board that decedent had taken his own life.

The ultimate question addressed to the psychiatrist-witness was not whether the decedent was sane or insane when he suffered the gas poisoning, but whether he could state with a " reasonable degree of medical certainty " whether the " accident " and the " circumstances " between the accident and the suicide were competent producing causes of the suicide. There was thus addressed to a physician neither a medical nor a psychiatric question, but an ultimate fact-finding problem not within his legal competence. This is not the kind of task which, in a judicial or quasi-judicial inquiry may be passed along to any witness.

The opinion given not only accorded a controlling weight to the assumption that the death was suicide, but it gave expression to impressions of events in the doctor's mind which bear little resemblance to what actually occurred from the undisputed facts in the case, and indicates that to reach them he rejected large parts of the record.

First, his answer to the hypothetical question was that " I believe " that the accident was a " factor " in the symptomatology that succeeded it and was also a " factor " in " the suicide " are expressions of indefinite opinion which could be admitted or rejected in full without any effect whatever upon the question the board was called on to decide.

Second, the physician proceeded thereupon into fields of the merest factual speculation. He felt that the decedent had such intractable pain that this and his feeling of hopelessness " so undermined his reason " that it " weakened his will power " and he was then " unable " either to govern or control " any " conscious act and " for that reason " there was a relationship between the accident and " the suicide ".

Whatever else this may be, it is not evidence and it is not an informed opinion based on evidence, but merely an imaginative structure built upon a foundation of theory.

There is no substantial basis for finding that this decedent who made good progress under medical care and who is shown himself to have made careful and sensible arrangements for his own future medical treatment on the night before the gas poisoning occurred was unable to control " any " conscious act.

Nor is there any basis to treat as substantial evidence a witness' hypothetical assumption that any such situation as he described actually existed. There is thus in this record not only an assumption based on another assumption, i.e., the suicide, but an assumption based on a theory for which there is no substantial factual support.

On this branch of the case the board was met with a presumption that the decedent was sane; and if he was sane, of course, a suicide could not be charged against the accident as a matter of law. The leading case in New York on this, perhaps, is *Weed* v. *Mutual Benefit Ins. Co.* (70 N. Y. 561). The action was on a life insurance policy. Suicide of the insured was conceded. There could be no recovery if this were his voluntary act, unless he was insane.

There was some proof in that case that he had periods of severe, prostrating headaches, and evidence of incoherent answers to questions on one or two occasions, but he continued to handle his usual business. On evidence as consistent with sanity as with insanity, the court was of opinion the finding under the presumption must be for sanity and a judgment of nonsuit was affirmed. To say this is to say that in such equivocal circumstances it is to be regarded that there is no substantial proof of insanity.

Moreover, it is the rule in New York that insanity cannot be inferred from suicide. The case which announces this doctrine upon well-settled authority is *Roche* v. *Nason* (185 N. Y. 128) a will-contest case arising from the suicide of a County Judge who had within a year been treated in a sanitorium for " nervous prostration " or " exhaustion ". See, also, the parallel decision at the General Term in *Coffey* v. *Home Life Ins. Co.* (3 Jones & Sp. 314).

The result reached here is without substantial evidence charging as an industrial accident the death of decedent from gas poisoning, and the award for death benefits should be reversed and the claim based on such benefits dismissed, with costs to appellants.

BREWSTER and COON, JJ., concur with BERGAN, J.; FOSTER, P. J., dissents, in the following memorandum, in which HEFFERNAN, J., concurs: I am constrained to the view, despite Justice BERGAN's able opinion, that there is substantial evidence in the record of this claim to support the board's finding that decedent " suffered from a mental derangement ". The doctrine enunciated in the *Delinousha* case (*Matter of Delinousha* v. *National Biscuit Co.*, 248 N. Y. 93) must be applied cautiously I believe. There are many forms of mental derangement which exist independently of actual physical degeneration of the brain tissues, and the field of psychiatry has widened considerably since the opinion in the *Delinousha* case was written. I feel that I cannot say as a matter of law there is no substantial evidence to sustain the findings of the board, hence I vote to affirm.

Award for death benefits reversed, on the law, and the claim based upon such benefits dismissed, with costs to the appellant.