## JOSEPHINE C. ANDERSON v. ARMOUR & COMPANY.

101 N. W. (2d) 435.

February 5, 1960—No. 37,782.

*Mahoney & Mahoney,* for relator.
*James Howard Hill,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Certiorari to review a decision of the Industrial Commission awarding death benefits to the dependents of a deceased employee of Armour & Company, hereinafter referred to as relator.

The facts are substantially as follows: Lawrence W. Anderson had been employed by relator as a truck driver for about 25 years. He worked out of its plant at South St. Paul. His duties consisted of operating the truck over a designated route and selling therefrom relator's meat products to customers on the route. While so engaged on Thursday, January 31, 1957, the truck driven by Anderson ran into a pedestrian, one Raymond W. Buggert, when he was performing surveyor duties on Highway No. 70 at Alpha, Wisconsin. The impact threw Buggert about 80 feet, causing injuries to him but none to Anderson. It appears from the record that Anderson did not see Buggert at any time before the accident although the latter was in plain view on the highway.

Anderson was arrested at the scene of the accident and was taken to court at Grantsburg, Wisconsin, where he pleaded guilty to careless driving and paid a fine.

Upon notification, relator sent a relief driver, one Merlin Clausen, and a substitute truck to Grantsburg, where the load was transferred. Clausen and Anderson drove to Frederic, Wisconsin, where they spent the night. On the following day, they completed the route deliveries and returned about 4 o'clock to South St. Paul.

Clausen testified that on the trip back Anderson helped with the deliveries, did not limit his activities in any way, and appeared sane to him. They made a delivery at the Gregory Johnson store at Danbury, Wisconsin, that day. Johnson said that Anderson was quite nervous and seemed very perturbed at that time.

On his return trip from Frederic that day, Anderson telephoned his wife and told her about the accident, stating that he did not want to discuss the matter in the presence of their children. He arrived at his home in Minneapolis about 5 p. m. Friday evening. His wife said he did not eat his steak "like he used to" and spent the rest of the evening just walking the floor.

They retired about midnight, but he did not sleep well. He got up early Saturday morning, whereas, according to his wife, his custom had been to spend most of Saturday in bed. He stayed around the house most of that day but did not read the paper as usual and only walked

about the house. His wife said that she had him go shopping with her, which was unusual, "just to get him out of the house" and "keep busy." They remained home Saturday evening, but "he still just walked the floor"; he did not read anything but would sit down once in a while and look at television and get up and walk away from it.

She said that he did not sleep well Saturday night; that he was up early Sunday morning, "another unusual thing." She left in the morning with the children for Sunday school and church and returned to her home to prepare dinner. He was "pacing the floor" when she arrived; she suggested that he go out and see someone he knew that might help. He indicated he would as he said that he had to go to the store. He returned in a couple of hours, visited briefly with his wife and sister-in-law, and then went out to the garage where he "puttered with the car." He retired about 11 o'clock that night after taking a sleeping pill but was "restless" and "slinging around" in his sleep.

On Monday morning he visited relator's plant for a 10-o'clock appointment and returned home in the midafternoon. He took another sleeping pill that night and slept, but somewhat restlessly. He returned to work Tuesday, February 5, and upon his arrival home that evening his wife said that he "looked * * * tired and drawn" and at times "just kind of sat looking off into space, and once in a while his face seemed to flush up on him."

He continued to express concern about the accident with some employees of customers upon whom he called the following day. He talked also about the possibility of losing his job and commented on one occasion that he did not know what he would do "if the party would die."

Undersheriff Stusek of Burnett County, Wisconsin, testified that Anderson telephoned him from Pine City sometime between January 31 and the date of Anderson's death on February 7, 1957, and asked how Buggert was getting along. The officer informed him "very well" and suggested that he should stop up and see Buggert. He stated that Anderson "was very concerned" at that time about the injured man's condition "and I was trying to probably soothe his concern." The of-

ficer further stated: "I told him that Mr. Buggert was coming along fine, because by that time I knew Mr. Buggert was not in a condition where he might die, because Mr. Anderson was aware of the fact he might have been taken for further charges providing Mr. Buggert did not live * * *." Stusek said that the telephone call was typical of people involved in accidents; that he has many such calls; and that there was nothing about Anderson's that was different from others.

On Thursday, February 7, Anderson made his usual delivery stops at Pine City, Minnesota. He called at C. A. Blanchard's bakery where he had made some previous deliveries. Blanchard described him as a perfect gentleman and said that he appeared perfectly normal that day. In the course of their conversation, Blanchard said, Anderson told him about the accident and said that he had not been feeling so good, "all out of sorts," and that "it's things like this that seem to tear your heart out."

Upon completing his deliveries at Pine City, Anderson next stopped at the Nelson Locker Plant, northwest of that place, where he arrived about noon. After making his deliveries, he talked a while with the Nelsons before leaving for his next stop, which was to be Grantsburg, where Buggert, the man injured in the January 31 accident, was hospitalized. Mrs. Nelson, who was wrapping meat at the time, testified that he appeared about the same as usual in making his deliveries. She said, however, that just before he left he picked up one of the boning knives and pushed it into some meat that was cut and ready for hamburger, a thing she had never seen him do before. He then walked out the door, but she did not notice that the knife was missing.

After Anderson went out, he rearranged some things in the back of his truck, and then drove out to the driveway near the main road, where he parked his truck about a block from the locker.

Sometime after lunch, about 1 p. m., Nelson noticed the truck still in the driveway. He went out, opened the door, and observed Anderson slumped over the steering wheel, dead. It appears from the evidence that he had taken his own life by slashing his wrists with the boning knife and then plunging it into his heart.

Dr. Leemhuis, a specialist in neurology and psychiatry, testified on

behalf of the respondent, Mrs. Anderson. In response to a hypothetical question which embodied essentially the foregoing facts, Dr. Leemhuis testified that there was a causal connection between the Buggert accident and Anderson's death. It was his belief that following that accident Anderson "became worried and depressed, nervous," and that it preyed on his mind. Even though he continued to work in a routine manner "he was in a depression, and that on the date of his death when he saw the knife and plunged it into the meat, that he had an uncontrollable impulse to end his life and at that time did so. I believe that the individual, while he may have had thoughts prior about doing some harm to himself, was in conscious control of his emotions, but at the time that the deed was done the impulses were so great that his conscious rational control was lost and at that point he was in a psychotic depression or in the lay term, insane." It was the doctor's opinion that whether Anderson received any bodily bruises was not significant. On cross-examination he said, "As far as the stabbing or the killing himself, I believe that the impulses were so great that he could not help himself."

Dr. Hammes, Jr., a specialist in neurology and psychiatry, testifying on behalf of the respondent and in response to the same hypothetical question, said there was a causal connection between the accident and the suicide. He further said that "the accident of January 31st, 1957, precipitated the onset of a psychotic depressive reaction. It did this, in my opinion, by precipitating a feeling of uncertainty about his ability to drive safely, feelings of guilt about having caused this injury, and feelings of fear of reprisal for the accident. I feel that the suicide developed as a result of the psychotic depressive reaction occurring as an impulsive act in a patient suffering from this psychosis on the 7th of February, 1957." Dr. Hammes also testified, "It would be my opinion that the suicide was an impulsive act and was not premeditated." With reference to Anderson he testified, "In my opinion he at the time of the impulse to commit suicide lost his ability to control his rational thinking to the extent of preventing such an act."

On the other hand, Dr. Hengstler, a specialist in neurology and psychiatry, testified on behalf of the relator that there was a causal

connection between the accident and the suicide; that Anderson "developed a depressive reaction following this accident," but that "it was what we call a neurotic depressive reaction which means an emotional disturbance with personality changes but not an insane condition." He said, "The act of suicide, in my opinion, was planned as his solution of this neurotic and upset emotional state. I believe it falls into the category of the suicide of a neurotic and upset individual rather than psychotic." He testified in substance on cross-examination that suicide resulting from a neurotic depressive reaction is a planned act whereas "irresistible impulse is associated with the psychotic depressive reaction."

Upon relator's appeal to the Industrial Commission, the findings and decision of the referee were affirmed. They were in substance:

(1-2)   That on January 31, 1957, and February 7, 1957, Anderson was in the employ of relator under a Minnesota contract of hire, while relator was a duly authorized self-insurer for its liability under the workmen's compensation law.

(3)   That on January 31, 1957, the employee was involved in a highway accident while operating the employer's delivery truck, said accident arising out of and in the course of his employment, but said employee suffered no physical injuries as a result of this highway accident.

(4)   That on February 7, 1957, the said employee, while suffering from a psychotic depression resulting from his said highway accident of January 31, 1957, took his own life and that said action arose out of and in the course of his employment with said employer. An award based on the Minnesota Workmen's Compensation Act was made to the widow and children of decedent Anderson.

Relator contends the commission erred in making finding (4), in failing to find that Anderson's death was intentionally self-inflicted, and in awarding compensation to his dependents. It argues that the undisputed evidence shows as a matter of law that Anderson did not suffer any physical injury or occupational disease, and therefore was not entitled to compensation. It further contends the evidence shows as a matter of law that Anderson's death was intentionally self-inflicted

so as to preclude an award of compensation to his dependents by virtue of M. S. A. 176.021, subd. 1, which provides:

"Except as excluded by this chapter all employers and employees are subject to the provisions of this chapter. Every such employer is liable for compensation according to the provisions of this chapter and is liable to pay compensation in every case of personal injury or death of his employee arising out of and in the course of employment without regard to the question of negligence, unless the injury or death was intentionally self-inflicted or when the intoxication of the employee is the proximate cause of the injury. The burden of proof of that fact is upon the employer."

Relator maintains that if Anderson's death were self-inflicted his dependents are not entitled to an award of compensation regardless of whether he has sustained a personal injury or occupational disease. It argues that his death was self-inflicted unless he was insane at the time he killed himself. Relator claims that the evidence shows without dispute or contradiction that Anderson intended to kill himself; that he took the knife at Nelson's Meat Market for that purpose; and that he acted deliberately, intentionally, understandingly, and consciously in everything he did, including the act of killing himself. Respondent contends that Anderson was incapable of acting intentionally at the instant that he cut his wrists and plunged the knife into his body because he was the victim of an uncontrollable urge to kill himself at that instant and that his condition at that time was one of insanity.

We have repeatedly said that it is the policy of this court, in reviewing the findings of the Industrial Commission, not to determine whether on the facts the decision of the commission is correct or even preferable to another, but, rather, only to determine whether the findings have sufficient basis of inference reasonably to be drawn from the facts. Schwerzler v. Frankamp, 255 Minn. 95, 97, 95 N. W. (2d) 503, 505; Jurich v. Cleveland-Cliffs Iron Co. 233 Minn. 108, 111, 46 N. W. (2d) 237, 239; Torrey v. Midland Cooperatives, Inc. 253 Minn. 489, 93 N. W. (2d) 135.

Here there is evidence to the effect that prior to the accident on January 31 Anderson had led what appears to have been a normal

life for many years; that he was a somewhat quiet, home-loving person who did not drink; that he liked people and in turn was respected for his industry and ability. He was described as a pleasant, likable person. He had a record of more than 25 years in the employ of relator. During that time the record does not indicate that he had any other prior automobile accidents. To the contrary it appears that he had received safe-driving awards covering other periods of time. There is evidence that his health was good and that he ate and slept well prior to the accident. It is further apparent that from that time on some change came into his life that materially affected his thinking and mode of living.

Two qualified doctors, Dr. Leemhuis and Dr. Hammes, each testified that in his opinion there was a causal connection between the accident on January 31 and Anderson's death by suicide. Doctor Leemhuis said that he believed that following the accident Anderson became worried, depressed, and nervous, and that it preyed on his mind; that even though he continued to work, he was in a depression; and that on the date of his death, when he saw the knife and plunged it into the meat, he had an uncontrollable impulse to end his life and did so. In discussing insanity Dr. Leemhuis explained that it is a very complicated thing to define. Among other things he said that an individual was insane or psychotic when he was out of touch with reality or had lost rational or conscious control over his acts. This he claimed was the situation here. When asked at what point before he stabbed himself was Anderson not in control of his actions, the doctor replied that at the time he plunged the knife into the meat he had this apparent severe impulse to kill himself even though he still had conscious control and was able to go to the car and load it and drive out of the driveway. This impulse or desire, however, according to the doctor was so great that that portion of Anderson's personality or emotion "was out of step with the rest of his being, he was out of control as far as his conscious rational thinking, and that portion took over when he plunged the knife into his chest." When asked whether Anderson then had conscious volition so as to know the nature of the act he was doing, the doctor said he knew what he was doing, but

that did not mean he had conscious volition because apparently at that moment he lost conscious control over his behavior.

It was Dr. Hammes' opinion that Anderson had the type of personality in which psychotic depressive reaction is likely to occur; that in such an individual the accident precipitated the onset of a psychotic depressive reaction. The doctor said he considered the words insanity and psychotic as synonymous. He testified that the suicide developed as a result of the psychotic depressive reaction occurring as an impulsive act in a patient suffering from this psychosis on February 7, 1957. It was his opinion that the suicide was an impulsive act and not premeditated.

In 5 Schneider, Workmen's Compensation (3 ed.) § 1411(e), is the following statement:

"The bearing of the statutory provision to the effect that no compensation shall be paid if the disability or death is due to intentional self-inflicted injury is under the decisions, not material if the proof shows the employee's insanity or mental derangement due to the accident was of a degree that he killed himself while possessed of an *uncontrollable or irresistible impulse* or while in a delirium of frenzy without rational knowledge of the physical consequences of his act." (Italics supplied.)

In Anderson v. Grasberg, 247 Minn. 538, 78 N. W. (2d) 450, we recognized the principle that one may commit an act knowing it was wrong and with full realization of its consequences, yet the act may be the result of insanity rather than the individual's own conscious act.

It appears to us from the record here that there is no question but that there was a causal connection between the accident and the suicide. There are two things in the record which could have given rise to the situation which resulted in the suicide. One was the fact that the boning knife was available at the Nelson shop, and the other was that when leaving the shop Anderson was apparently on his way to the place where the accident happened.

While the record disclosed a conflict in the expert testimony, it is

the rule that "A conflict in the opinions of expert witnesses is to be resolved by the trier of fact, * * *." 7 Dunnell, Dig. (3 ed.) § 3334.

It is our opinion that there is evidence in the record upon which the commission might reasonably have reached the conclusion which it did. Respondent is allowed $250 attorney's fees in this court.

Affirmed.

MR. CHIEF JUSTICE DELL and MR. JUSTICE MATSON took no part in the consideration or decision of this case.