BARBARA JEAN LEHMAN v. A. V. WINTERER COMPANY AND ANOTHER.

136 N. W. (2d) 649.

July 30, 1965—No. 39,629.

*James G. Paulos,* for relator.
*McLeod & Gilmore,* for respondents.

MURPHY, JUSTICE.

Certiorari to review an order of the Industrial Commission denying compensation for death resulting from suicide which relator contends was work-related so as to require compensation under the Workmen's Compensation Act.

From the record it appears that decedent, Ronald Dean Lehman, was employed by the employer-respondent as an apprentice steamfitter on November 4, 1958, at which time he sustained a personal injury which arose out of and in the course of his employment. Up to the time of his death, May 11, 1962, he had collected $3,150 in compensation. The injury occurred while he was unloading steel pipe from a truck. One of the pipes rolled off the truck and struck him across the lower back. He was hospitalized for a short period, and after being released from the hospital he continued to suffer a great deal of pain in the lower back. Dr. Frank S. Babb, who examined decedent in 1961, stated:

"* * * [H]e was twenty-three years of age, he was well musculatured, he weighed a hundred eighty pounds and stood six feet, one and three-quarters inches tall, he walked into the examining room. No apparent distress. He had no limp. His back was straight, no deformity. He referred

his pain across the lower back at the lumbosacral level and his pain radiated out into both thighs but not down his legs. He was able to bend forward without any deviation although there was flattening of the lumbar curve and some spasm in the erector spinea muscles. Side bending was not limited but extension of the back, bending of the spine, was painful. The tendon reflexes in the lower extremities were normal. There was no evidence of any neurological defect. In the recumbent position, the lower extremities were the same length, the hip joints were normal, straight leg raising test was painful at sixty degrees on both sides, pain was referred to his lower back but not into his legs. Flexing his thighs on his abdomen reproduced pain in the lower back. There was localized tenderness in the mid-line at the lumbo-sacral level."

The doctor was of the opinion that the accident sustained on November 4, 1958, aggravated a preexisting "congenital abnormality in the lumbosacral level of his spine, consisting of a defect in the neural arch, a so-called spondylolysis. It was my opinion that this basically was the condition responsible for his pain." A spinal fusion calculated to relieve the pain was performed on August 29, 1961. It was the medical opinion that the operation had been successful although decedent "did complain of a jumping sensation in the muscles of his legs." The lower back pain "had been improved, if not almost completely relieved." On February 5, 1962, X rays revealed evidence of a solid fusion. Decedent had agreed that he was much better than before the operation.

Because of pain and hospitalization decedent did not work much of the time following the accident. Between June 1960 and January 1961 he was self-employed as a truckdriver. Subsequently, he became a spot welder. But he did not work regularly and he seemed to be concerned that he would not be able to get employment and was worried about the problem of making a living.

At the time of his death, decedent had been divorced from the mother of his two children. He was living with a young girl who was pregnant and whom he intended to marry. On the evening of his death, he had visited some bars with this girl and his brother. During the course of the evening a dispute arose between him and his girl friend. It appears that she refused to let him drive his car because he did not have a license. At his request the

girl friend and his brother drove him back to the apartment and she accompanied him into it. A short time later she and decedent's brother were leaving the apartment building when they heard a shot. On reentering the apartment they found decedent lying on the floor with a .35 deer rifle near his body.

A psychiatrist called by the petitioner expressed the view that the suicide was induced by the fact that the deceased became so emotionally upset and disturbed by reason of the injury to his back, the surgery performed, and his lack of employment that the suicide resulted from an uncontrollable impulse. It is on this evidence that the petitioner contends the death resulted from a mental derangement which was related to the accident of November 4, 1958.

■　The general rule seems to be that where insanity and suicide follow an injury to a workman which was otherwise compensable compensation may be awarded if the act of suicide resulted from an uncontrollable impulse or in a delirium of frenzy and without conscious volition to cause death, since under such circumstances there was a direct and unbroken causal connection between the physical injury and suicide and no intervening cause. Annotation, 143 A. L. R. 1227; 99 C. J. S., Workmen's Compensation, § 205.

In the recent case of Anderson v. Armour & Co. 257 Minn. 281, 101 N. W. (2d) 435, we discussed the general subject of whether suicide may be compensable under the Workmen's Compensation Act and there noted that even though death may be intentionally self-inflicted (Minn. St. 176.021, subd. 1), the resulting death may nevertheless be compensable (257 Minn. 281, 101 N. W. [2d] 436)—

"* * * if it results from insanity precipitated by some incident arising out of and in the course of his employment, and the employee's insanity or mental derangement due to the incident was of a degree that he killed himself while possessed of an uncontrollable or irresistible impulse or while in a delirium of frenzy without rational knowledge of the physical consequences of his act."

In the Anderson case an event occurring in the course of the decedent's occupation gave rise to a psychotic depressive condition which resulted in suicide a week later. We held under the facts in that case that the mental

derangement followed proximately and directly from the work-related incident.

In the case before us the suicide followed about 3½ years after the work-related injury. We think the record here supports the conclusion of the Industrial Commission that the brain derangement which resulted in his death was not causally connected with his physical injury. The possibility that his suicide resulted from a state of depression or despondency caused by the work-related injury is too remote and speculative to support an award. Matter of Aponte v. Santiago & Garcia, 279 App. Div. 269, 109 N. Y. S. (2d) 761; Matter of Seal v. Effron Fuel Oil Co. 284 App. Div. 795, 135 N. Y. S. (2d) 231. There is factual basis in the record to support the conclusion of the psychiatrist who testified that the original injury had nothing to do with the suicide. He said:

"Well, there are many facets for the reason I would feel that way. First of all, this patient was an emotionally unstable individual and had been for a number of years. He had domestic difficulty over a long period of time with the first wife. He had drank, probably to excess, and it had been increasing. He had had trouble with the law on a number of occasions, been involved in brawls and knifings. Even though he may have had some pain as a result of surgery and some discomfort in the back, the events just prior to the suicide are one of a domestic quarrel aggravated by alcohol with probably paranoia feelings and possibly even delusions that there was something between his brother and his so-called wife, which are characteristic of individuals using alcohol to an excess. The act of suicide would apparently be to me as a result of a domestic quarrel aggravated by alcohol in an unstable individual, most likely a psychopathic deviate."

◼ Moreover, our decision must be controlled by the numerous authorities which hold that it is the function of this court to determine whether the evidence is such that the commission might reasonably have come to the conclusion it did. The findings will not be disturbed unless they are manifestly contrary to the evidence or unless consideration of the evidence and the inferences permissible therefrom would clearly require reasonable minds to adopt a contrary conclusion. 21 Dunnell, Dig. (3 ed.) § 10426.

Affirmed.