**STATE FARM FIRE & CASUALTY COMPANY, Respondent,**

v.

**James C. WICKA, Special Administrator of the Estate of Stephen Bradley Kintop, Defendant,**

**Paul R. Peterson, Appellant.**

**No. C4–90–312.**

Court of Appeals of Minnesota.

Oct. 9, 1990.

Review Granted Dec. 14, 1990.

W. Scott Herzog and Peter A. Koller, Moss & Barnett, Minneapolis, for appellant.

William M. Hart and Kenneth W. Dodge, Meagher & Geer, Minneapolis, for respondent.

Considered and decided by LANSING, P.J., and KALITOWSKI and DAVIES, JJ.

## OPINION

LANSING, Judge.

Paul Peterson challenges the trial court's order granting a new trial based on the jury's knowledge of the affect of the verdict on insurance coverage. Peterson also challenges the subsequent summary judgment for State Farm on the issue of the intentional act exclusion. We affirm the order for a new trial but reverse the order for summary judgment.

## FACTS

Stephen Kintop shot and killed himself after firing four rounds into the head of Paul Peterson. Peterson, although seriously injured, survived the incident and sued Kintop's estate for damages. The special administrator of Kintop's estate tendered defense of the action to State Farm Fire & Casualty Company, which insured Peterson under a homeowner's policy.

State Farm began this declaratory judgment action to determine whether the homeowner's policy provided liability coverage for the injuries sustained by Peterson. According to State Farm, there was no coverage because Kintop's conduct fell within the intentional act exclusion of the insurance policy, which provided:

Medical Payments to Others do not apply to:

(a) bodily injury or property damage which is expected or intended by the insured * * *.

Peterson's sole theory of insurance coverage rests on the proposition that Kintop, because of mental illness, lacked the mental capacity to intend injury.

The record discloses a series of Kintop's erratic and abusive acts prior to the shooting incident. In 1980, Kintop began a dating relationship with Colleen Hughes, marked by several incidents of abnormal conduct. One of the first occurred in April 1981, when Kintop showed Hughes a gun and threatened to kill himself if she broke up with him. In May 1981, Kintop and Hughes were driving together when Kintop pulled the car off to the side of the road and punched her in the face. In June 1981, Kintop and Hughes were again driving together when Kintop pulled Hughes' head into his lap, claiming he was going to kill both of them.

Kintop's erratic behavior did not improve during the next several months, and in October 1982, Hughes broke up with him when he shoved his head through her bedroom wall after unsuccessfully attempting to rape her. Hughes began dating Peterson but continued to see Kintop socially during November and December 1982. On December 28, 1982, Kintop apparently struck Hughes several times, pulled some of her hair out, spoke in a "weird language," and licked her head all over.

Kintop's bizarre behavior accelerated and on December 31, 1982 at 3:00 a.m., Kintop arrived unexpectedly at Hughes' home. Hughes invited him in and the two of them, along with Hughes' roommate, sat down to talk. When Hughes received a telephone call from Peterson, Kintop dumped a beer on her head and ripped off her bathrobe. Hughes began to scream, prompting Kintop to stick his finger down her throat and slam her to the floor. Then, "with a real sad look", Kintop ran out the back door. A short time later Kintop called Hughes on the telephone and Hughes told him she intended to get a restraining order. Kintop responded that she needn't worry, "you'll never see me again." Hughes finished the conversation and went upstairs to bed.

Peterson arrived at Hughes' home and began talking to her roommates down-

stairs. While they were talking, Kintop, armed with a gun, broke down the front door to the house. Peterson fled out the back door, but Kintop chased him into the street and shot him in the head four times. Then Kintop killed himself.

The procedural history of this declaratory judgment action is lengthy. In August 1986, the trial court denied a motion by State Farm for summary judgment. At the end of September 1988, a jury trial was held on the single question of whether Kintop, at the time of the shooting, lacked the mental capacity to intend to injure Peterson. Dr. William Brauer, a psychiatrist, testified at trial that, in his opinion, based on Kintop's history of bizarre behavior, Kintop had a deranged intellect which deprived him of the mental capacity to govern his conduct in accordance with reason. The jury apparently agreed with this assessment and returned a special verdict finding that Kintop lacked the mental capacity to intend to shoot Peterson.

In February 1989, the trial court ordered a new trial, concluding that it had violated Minn.R.Civ.P. 49.01(a) by telling the jury how the special verdict would affect the ultimate outcome of the case. In July 1989, the case was assigned to another judge, and State Farm renewed its motion for summary judgment, this time successfully. The trial court ruled that Dr. Brauer's testimony was not competent evidence and concluded that there was inadequate evidence to support a reasonable finding of mental incapacity.

Peterson[1] now appeals, challenging the order for a new trial and the granting of summary judgment.

## ISSUES

1. Did the trial court abuse its discretion in ordering a new trial because it had advised the jury, over State Farm's objection, how the special verdict would affect the outcome of the case?

2. Is the "intentional act" exclusion in State Farm's homeowner's insurance policy inoperative, as a matter of law, if the insured is insane at the time of injury?

3. Is there a genuine issue of material fact on whether the insured's acts were intentional?

## ANALYSIS

### I.

At the outset, we must consider whether the trial court correctly ordered a new trial based on Minn.R.Civ.P. 49.01(a) (1988). Rule 49.01(a) provides, in pertinent part:

> The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. * * * The court shall give to the jury such explanations and instructions concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. *[N]either the court nor counsel shall inform the jury of the effect of its answers on the outcome of the case.*

(emphasis added).

■ The trial court, over State Farm's objection, advised the jury how the special verdict would ultimately affect Peterson's right to insurance proceeds. These remarks to the jury violated Rule 49. *See, e.g., State Farm Fire & Casualty Co. v. Short*, 459 N.W.2d 111 (Minn.1990); *McCourtie v. United States Steel Corp.*, 253 Minn. 501, 515–18, 93 N.W.2d 552, 562–564 (1958). The trial court later recognized its error and, believing its statements were prejudicial, ordered a new trial.

We have reviewed the record and do not believe that the trial court's decision to order a new trial was a clear abuse of discretion. *See Short.* The trial court was in a better position than we are to measure the jury's reaction to its statements.[2]

---

**1.** Peterson has been assigned the special administrator's rights against State Farm pursuant to a Miller–Shugart agreement.

**2.** We note that, unlike the situation in *Short*, State Farm did not invite an explanation of how the special verdict would ultimately affect the outcome of the case.

## II.

In reviewing the summary judgment ruling there are two questions that must be decided: (1) whether an intentional act exclusion is inoperative, as a matter of law, if the insured was insane at the time he or she caused injury; and, if so, (2) whether there is a genuine issue of material fact on the sanity of the insured which precludes summary judgment.

The supreme court has expressly reserved consideration of the relationship between mental illness and intent for purposes of insurance coverage. *American Family Mutual Insurance Co. v. Peterson*, 405 N.W.2d 418, 422 (Minn.1987). In *Peterson*, an insured struck an individual on the head with a hammer for no apparent reason. The insurer denied coverage on the grounds that the act was intentional. Evidence submitted at trial indicated that at the time of the assault, the insured was intoxicated and in a blackout stage, lacking the mental capacity to intend to cause injury. The jury returned a verdict finding that the insured's state of intoxication negated intent.

On appeal, the supreme court ruled that voluntary intoxication cannot, as a matter of law, negate intent for purposes of insurance coverage, reasoning that an insured should not expect to be protected by insurance when committing an assault while voluntarily intoxicated. The court expressly declined to consider whether this same ruling results when mental capacity is affected by mental illness, an *involuntary* condition.

■ Outside Minnesota, there are two lines of authority on the issue of whether insanity negates intent for purposes of insurance coverage. Most courts hold that if an injury results from an insane act, the intentional act exclusion does not apply and the insurer is liable. *See Globe American Casualty Co. v. Lyons*, 131 Ariz. 337, 339–40, 641 P.2d 251, 253–54 (Ariz.Ct.App.1981); *Clemmer v. Hartford Insurance Co.*, 22 Cal.3d 865, 887, 587 P.2d 1098, 1110, 151 Cal.Rptr. 285, 297 (1978); *Congregation of Rodef Sholom of Marin v. American Motorists Insurance Co.*, 91 Cal.App.3d 690, 695–97, 154 Cal.Rptr. 348, 351–52 (Cal.Ct. App.1979); *Mangus v. Western Casualty and Surety Co.*, 41 Colo.App. 217, 219–20, 585 P.2d 304, 306 (Colo.Ct.App.1978); *Arkwright–Boston Manufacturers Mutual Insurance Co. v. Dunkel*, 363 So.2d 190, 193 (Fla.Dist.Ct.App.1978); *Aetna Casualty & Surety Co. v. Dichtl*, 78 Ill.App.3d 970, 975–79, 34 Ill.Dec. 759, 763–65, 398 N.E.2d 582, 586–88 (Ill.App.Ct.1979); *West American Insurance Co. v. McGhee*, 530 N.E.2d 110, 112 (Ind.Ct.App.1988); *Nationwide Mutual Fire Insurance Co. v. Turner*, 29 Ohio App.3d 73, 76–77, 503 N.E.2d 212, 216–17 (Ohio Ct.App.1986); *Ruvolo v. American Casualty Co.*, 39 N.J. 490, 189 A.2d 204, 207–209 (1963).

These courts recognize that the primary purpose of the intentional act exclusion is to deter assaults by removing the insured's financial safety net. The exclusion has no deterrent effect, however, on individuals who, by reason of mental derangement, are incapable of governing their conduct in accordance with reason. Furthermore, the public's strong interest in compensating victims would be frustrated by an unduly broad interpretation of the exclusion.

Some courts have rejected this analysis, ruling that the act of an insured is "intentional" if the insured is conscious of the natural physical consequences of the act, regardless of whether the insured is otherwise sane. *See Colonial Life & Accident Insurance Co. v. Wagner*, 380 S.W.2d 224, 226–27 (Ky.1964); *Rider v. Preferred Accident Insurance Co. of New York*, 183 A.D. 42, 43–44, 170 N.Y.S. 974 (1918), *aff'd*, 230 N.Y. 530, 130 N.E. 881 (1920); *Deloache v. Carolina Life Insurance Co.*, 233 S.C. 341, 344, 104 S.E.2d 875, 876 (1958); *Pruitt v. Life Insurance Co. of Virginia* 182 S.C. 396, 398, 189 S.E. 649, 649–50 (1937); *Johnson v. Insurance Co. of North America*, 232 Va. 340, 345–48, 350 S.E.2d 616, 619–21 (1986); *Kipnis v. Antoine*, 472 F.Supp. 215, 220–21 (N.D.Miss.1979); *see generally* 10 *Couch on Insurance 2d*, § 41:676 (rev. ed. 1982); Annotation, *Liability Insurance: Intoxication or Other Mental Incapacity Avoiding Application of Clause in Liability Policy Specifically Exempting*

*Coverage of Injury or Damage Caused Intentionally by or at Direction of Insured,* 33 A.L.R. 4th 983 (1984).

Taking a more restrictive view of the exclusionary clause, and apparently disagreeing with the public policy reasons supporting a more expansive interpretation, these courts reason that whether an individual's conduct is "legally excused" because of mental illness has no direct bearing on the question of intent. *Johnson* typifies this position. In *Johnson,* the court stated:

> Here, when [the insured] aimed the pistol at Johnson, he knew that he was shooting a human being. Acting deliberately and methodically, [the insured] had searched for and found a pistol, loaded it, travelled to the victim's home, waited for him, begun talking with him, and shot him from close range. He acted with resolve and determination, not knowing that what he was doing was wrong because God had ordered him to act. In pointing the pistol at Johnson, [the insured] did not think, for example, that he was peeling a banana; he was not psychotic to an extreme degree, as the victim readily recognizes when he notes that [the insured] "did have a minimal degree of awareness of his actions." That is sufficient.

*Johnson,* 350 S.E.2d at 620. Even under this more restrictive view, courts acknowledge that if, because of mental illness, the insured is not conscious of the natural physical consequences of the act, the exclusion does not apply.

■ We believe that the rule adopted by the majority of the courts in this country is the better rule. A narrower interpretation of the exclusionary clause is not unreasonable, but ambiguities, particularly in exclusions, are construed against the insurer. *National Farmers Union Property and Casualty Co. v. Anderson,* 372 N.W.2d 71, 75 (Minn.App.1985) (citing *Caspersen v.*

*Webber,* 298 Minn. 93, 98, 213 N.W.2d 327, 330 (1973)). This is especially true when the conduct insured against involves injury to members of the public and when the policy rationale behind the clause is inapplicable. In our view, an insured could reasonably expect liability coverage for injuries resulting from acts committed at a time when, because of mental illness, the insured is unable to control his or her conduct in accordance with reason.[3]

III.

The final question is whether there is a genuine issue of material fact which precludes summary judgment. The second trial court, in granting summary judgment, ruled that (a) Kintop was voluntarily intoxicated at the time of the shooting; therefore, his act was intentional under *Peterson;* (b) there was no genuine issue of material fact on whether Kintop, at the time of the shooting, suffered from a mental illness which deprived him of the ability to control his conduct in accordance with reason; and (c) from the egregious nature of the act, intent must be inferred as a matter of law.

■ First, the court found that Kintop was voluntarily intoxicated at the time of the shooting. Applying *Peterson,* the court ruled that Kintop's act was therefore intentional, regardless of his mental capacity to form intent. Kintop's blood alcohol level of .10 at the time of his death does not conclusively establish "intoxication." Hughes' testimony on Kintop's speech, appearance and behavior shortly before the shooting raises a genuine question of whether Kintop was intoxicated. The jury, instructed on that issue, did not find that Kintop was intoxicated. Because there was a genuine issue of material fact on whether Kintop was intoxicated, the second

---

**3.** This position is consistent with *Meils by Meils v. Northwestern Bell,* 355 N.W.2d 710, 714–15 (Minn.1984) and *Anderson v. Armour,* 257 Minn. 281, 289, 101 N.W.2d 435, 440 (1960). In these cases involving workers' compensation claims, the supreme court noted that a person "may commit an act knowing it was wrong and with full realization of its consequences, yet the act may be the result of insanity rather than the individual's own conscious act." The court ruled that under such circumstances the act is unintentional.

trial court erred in granting summary judgment on this ground.[4]

Second, the trial court found that there was no genuine issue of material fact on whether Kintop, at the time of the shooting, suffered from a mental illness that deprived him of the ability to control his conduct in accordance with reason. The court ruled that the testimony of Dr. William Brauer, Peterson's only expert witness, could not be considered. Dr. Brauer testified at trial that in his opinion, based on Kintop's history of bizarre behavior, Kintop had a deranged intellect which deprived him of the mental capacity to govern his conduct in accordance with reason during the shooting incident. The second trial court rejected this testimony, stating:

[I]t is this court's opinion that there was insufficient foundation for the tender of Dr. Brauer's opinion. Dr. Brauer did not ever interview Mr. Kintop, nor did he ever treat him for any problem, either physical or mental, nor did he review any medical records of Mr. Kintop. There was no evidence of Kintop being treated for any psychiatric problems.

Peterson appears to concede that inadmissible evidence should be disregarded by the trial court when ruling on a motion for summary judgment. *See* Minn.R.Civ.P. 56.05 (1989); *Murphy v. Country House, Inc.*, 307 Minn. 344, 349, 240 N.W.2d 507, 511 (1976). He argues, however, that the trial court erred by ruling that Dr. Brauer's testimony lacked foundation. In considering this question, we will reverse the trial court's evidentiary ruling only if we find a clear abuse of discretion. *See Jones v. Fleischhacker*, 325 N.W.2d 633, 640 (Minn.1982).

■ The trial court apparently did not dispute Dr. Brauer's expertise in making a sanity determination, but questioned whether Dr. Brauer's opinion would be helpful to the trier of fact because of his lack of personal contact with Kintop. *See* Minn.R.Evid. 702 (1989). We believe that the exclusion of Dr. Brauer's testimony on this narrow basis was an abuse of discretion. Dr. Brauer's lack of personal acquaintance with Kintop is "more pertinent to the weight to be afforded the testimony than to its admissibility." *See In re Dibley*, 400 N.W.2d 186, 191 (Minn.App.1987) (quoting *Matter of Harhut*, 367 N.W.2d 628, 632 (Minn.App.1985), *pet. for rev. denied* (Minn. March 25, 1987)); *see also State v. Dick*, 419 N.W.2d 828, 831–32 (Minn.App.1988) (expert may base an opinion on facts presented at trial, without examining subject person), *pet. for rev. denied* (Minn. Apr. 15, 1988).

In *Anderson*, testimony of a similar nature was admitted into evidence under comparable circumstances. Two psychiatrists testified, based on the personal history of an individual who had committed suicide, that the individual lost rational control of his behavior at the time he killed himself. The psychiatrists had not interviewed or personally examined the individual. Although the question of foundation was not directly raised on appeal, the supreme court expressly recognized that the psychiatrists were "qualified" to give expert testimony. *Anderson*, 101 N.W.2d at 439–40. We likewise conclude that Dr. Brauer was qualified to give an opinion on the issue of Kintop's sanity, notwithstanding the absence of personal acquaintance.

Because Dr. Brauer's testimony is admissible evidence, a genuine issue of material fact does exist on whether Kintop, at the time of the shooting incident, was deprived of the ability to control his conduct in accordance with reason as a result of mental illness. The question of Kintop's sanity must be resolved by trial, not by summary judgment.

Finally, the second trial court ruled that Kintop's acts were so wanton and malicious that intent to injure could be inferred as a matter of law. This is a recasting of the expert testimony issue. Summary judgment is foreclosed if there is a genuine question of whether the insured, due to mental illness, lacks the capacity to form

4. We also observe that *Peterson* leaves open the possibility that a mentally deranged person can not become "voluntarily" intoxicated.

intent. Allowing courts to infer intent from physical acts alone, without addressing the question of mental illness, essentially defeats the rule permitting coverage when intent cannot be formulated. If a genuine issue of mental illness is raised, it is inappropriate to grant summary judgment based on an inference drawn from the malice or wantonness of the insured's acts.

Accordingly, we hold that the trial court erred by granting summary judgment in favor of State Farm.

## DECISION

The trial court did not abuse its discretion by ordering a new trial based on the violation of Minn.R.Civ.P. 49.01. The trial court erred, however, in granting summary judgment to State Farm because there was a genuine issue of material fact on whether Kintop's mental illness deprived him of the mental capacity to govern his conduct in accordance with reason.

Affirmed in part, reversed in part.