JENNIFER B. MALLIN, Individually, and JENNIFER B. MALLIN and ROBERTA GRILL, as Guardians of JESSICA B. MALLIN, and JENNIFER B. MALLIN as Special Administratrix of the Estate of VIRGINIA MALLIN EGYED, Deceased; EDITH EGYED, Executrix of the Estate of ALEX EGYED, aka ALEXANDER EGYED, Deceased; JEANNE DI FIORE COSGROVE; JOHN DI FIORE II; JARED E. SHAFER, Executor of the Estate of ELIZABETH BARTON DI FIORE, aka BETTY DI FIORE, Deceased; MILES LEVY; ELISE KAGASOFF; and JARED SHAFER, Administrator of the Estate of JACK LEVY, Deceased, Appellants, v. FARMERS INSURANCE EXCHANGE, a California Corporation, Respondent.

No. 20903

September 15, 1992                    839 P.2d 105

*Rogers & Rogers,* Las Vegas, for Appellant Jennifer B. Mallin.

*Beckley, Singleton, DeLanoy, Jemison & List* and *Daniel F. Polsenberg,* Las Vegas, for Appellants Mallin.

*Morse & Mowbray,* Las Vegas, for Appellant Egyed.

*Gordon & Silver* and *Don Springmeyer,* Las Vegas, for Appellants Di Fiore, et al.

*Thorndal, Backus, Maupin & Armstrong,* Las Vegas, for Respondent.

## OPINION

By the Court, SPRINGER, J.:

The case is brought by the personal representatives of three persons who were shot and killed at a residence insured by a homeowner's policy issued by Farmers Insurance Exchange. Farmers denies any liability under the policy because an intentional shooting is not an "accident" covered by the policy and because the policy contains an express exclusion of coverage for casualties "[a]rising as a result of intentional acts of the insured." The trial court granted summary judgment to Farmers, declaring that, under the undisputed facts of this case, Farmers was entitled to judgment as a matter of law. We affirm the summary judgment.

The homicides in question occurred in the following manner. The assailant, Alex Egyed, was having difficulties with his wife, Virginia Mallin. On the evening of the homicides, Virginia had attended a social event with her friends, Nina Schwartz, Betty Di Fiore and Jack Levy. Because of earlier misunderstandings with her husband, Virginia had decided not to stay at home that evening but, rather, to stay with her friend, Nina Schwartz. Before going to Nina's home, Virginia asked her friends to stop at her house so that she could pick up her daughter, Jessica. While Virginia was at the house, Alex confronted her and asked her to talk to him; she refused to talk to him, however. Alex then went to Jessica's room, where he found Jessica, a friend of Jessica's

and Betty Di Fiore. Alex shot Di Fiore in the head, killing her. He then left Jessica and her friend and went downstairs, where he found Virginia in the kitchen. Alex shot his wife in the head, killing her. He subsequently proceeded outside to the car occupied by Jack Levy and Nina Schwartz and shot Jack Levy in the head, killing him. Alex then returned to the house and shot and killed himself.

The insurance policy in this case provides coverage for "damages from an *accident*." (Emphasis supplied.) An accident, under the policy "means a sudden event . . . neither expected nor *intended* by the insured." The policy expressly exempts damages "[a]rising as a result of *intentional acts* of an insured." (Emphasis supplied.) As mentioned above, one of the insureds in this case, Alex Egyed, shot his wife and two of her friends in the head: Shooting three people in the head has every appearance of being an intentional act. If, instead of shooting his wife, Alex had, in a fit of anger, broken up all of their living room furniture, probably no one would have thought of filing an insurance claim; still, the claimants seek indemnity for losses which they claim resulted from an "accident" under Farmers' "Homeowners Package Policy."

Representatives of the unfortunate deceased victims, the claimants in this case, contend that the shootings were not "intentional acts." It is not easy to understand, under these circumstances, how shooting three people can be described as "unintentional." The claimants' expert psychological witness, Dr. Glovinsky, testified that in his opinion "at the point in time that Alex pulled the trigger he *intended* to *kill* her [his wife]" and that "Alex Egyed had the *intent* to *kill* her." (Emphasis supplied.) Of course Alex "intended to kill" his victims; and the trial court was justified on this record in holding that a jury could not have rationally concluded that Alex did not intend to kill three people. Because there is no evidence that the casualties in this case did not result from intentional acts of the insured, the trial court properly granted summary judgment to the insurance company.

It is curious to see how the claimants try to avoid the insurance policy language and how they can maintain that the killings in this case were accidental and not intentional. The claimants, through their expert witnesses, and in particular psychologist Glovinsky, advance the position that Alex was "unable to control his acts at the time of the homicides" and that Alex was "overcome by his emotions to the degree he was unable to make the rational decision not to commit the acts that he committed." Notwith-

standing Dr. Glovinsky's testimony that Alex was so overcome by emotion that he was unable to control himself, this expert witness testified not only that Alex *intended* to kill his victims but testified further that Alex's state of mind was such that he was mentally able to make a conscious decision *not* to shoot another person present at the time and place of the shootings, namely, his step-daughter, Jessica. Significantly, Dr. Glovinsky testified that Alex made the decision not to shoot his stepdaughter because "he had no malice toward Jessica."

In the face of the testimony of their own witness and the way in which Alex shot and killed these people, the claimants are hard-pressed indeed to argue that these killings were accidental and not, as they rather clearly appear to be, "intentional acts."

In its simplest denotation, an intentional act is merely "a willed muscular contraction."[1] We are speaking here, however, of more than the mere voluntary flexion of Alex's trigger finger and more, even, than the intentional shooting of a firearm. The mental process that is critical here is, in Dr. Glovinsky's words, Alex's "intent to *kill*" his victims. The "willed muscular contraction" of his trigger finger was accompanied here with the willed objective of taking the lives of three persons. Intention involves the intersection of two ideas: bodily motion and operation of the will. Specifically, "intent" or "intention" denotes a design or desire to cause the consequences of one's acts and a belief that given consequences are substantially certain to result from the acts. Restatement (Second) of Torts § 8A (1965). Alex had the design and desire to kill his wife and her friends and knew that shooting his victims in the head would result in their deaths. Thus, it must be fairly said that Alex *intended* to kill them.

The rather simple idea of what is intentional and what is accidental[2] is turned awry by modern psychoanalytical ("psychodynamic") theories, which put into question an individual's capacity to exercise free will over his or her actions. Those who follow these theories believe that unconscious and unwilled mental forces, and not individual will or intent, cause human actions. In the present case, when the claimants' psychological experts testify in their affidavits that Alex was not mentally able to make the moral decision as to whether or not he should kill, they are opining in terms of psychological theories that are far from being universally accepted and which, in my opinion, have been

---

[1] O. W. Holmes, *The Common Law* 54 (1881).

[2] As Justice Oliver W. Holmes wisely noted, "Even a dog distinguishes between being stumbled over and being kicked." O. W. Holmes, *The Common Law* 3 (1881).

expressly rejected by this court. *See* Sollars v. State, 73 Nev. 248, 316 P.2d 917 (1957). Thus, I give no credence to testimony stating that Alex was so overcome by emotion that he was not mentally able to make the kill or not-to-kill decision.

None of the claimants' experts testified that when Alex killed, he did not have the *intent* to kill. The testimony is directly to the contrary. Alex's supposed inability to *control* his acts is not the same as an inability to *intend* his acts. What the psychologists seem to be saying is that Alex actually did intend to kill these people but that because of some kind of psychological force Alex was not able to control or decide against doing these intentional acts. Such testimony does not bring Alex's damaging acts within the policy language; and, further, Nevada has expressly chosen, in its criminal law, not to relieve an assailant of responsibility for his or her acts by reason of mental compulsions or irresistible impulses.

Specifically, Nevada has rejected in its criminal law the so-called "volitional" defenses to criminal liability. The "loss of volitional control," the "I-couldn't-help-myself" defense of "irresistible impulse" was expressly rejected in *Sollars. Id.* at 253-55, 316 P.2d at 920. If we have refused to accept the loss of volitional control as a defense to criminal liability, it is inconsistent and most improvident for this court now to hold that it was permissible for a jury to decide that Alex did not intend to kill his victims because of his supposed loss of will power.[3] Thus, even *if* one of the experts had actually testified for the claimants that Alex, because he was overcome by emotions, did not or could not *intend* to kill his wife and her friends, it would still be necessary to hold, as a matter of law, that the deaths in this case resulted from the "intentional acts of the insured." In short, this court does not accept the described psychoanalytical theory which renders an individual not responsible for supposedly uncontrollable acts done in a rage or under other emotional stress.[4]

As stated above, the main thrust of the claimants' case is that Alex lost control of himself and thus lost control over his actions. The affidavit of William D. O'Gorman, M.D., however, goes

---

[3]We do not afford civil defendants the same defenses as we do criminal defendants, as criminal liability results in more severe penalties than civil liability. Therefore, if we have rejected the volitional defenses in our criminal law, these defenses certainly do not apply in our civil law.

[4]"Under this psychiatric concept no man could be convicted of anything if the law were to accept the impulses of the unconscious as an excuse for conscious behavior." State v. Sikora, 210 A.2d 193, 206 (N.J. 1965).

farther than this. Dr. O'Gorman testified that Alex was "unable to control his acts at the time of the homicides." He further stated that Alex "at the time of the shootings" was "suffering from an involutional psychotic reaction" and was unable "to distinguish right from wrong." This testimony is ostensibly based on the proposition that a person "who committed the act . . . in a state of insanity" is free from criminal liability. NRS 194.010(4). In other words, this testimony suggests that Alex, at the time of the homicides, did not have the mental capacity to commit a *crime.* The offered testimony on Alex's supposed criminal insanity is necessarily based on claimants' supposition that there is some relationship between the insanity defense in criminal cases and a person's mental capacity to perform volitional or intentional acts in a civil context. Any such relationship, if one exists at all, is tenuous at best.[5]

The principle of *insanity,* which provides a total defense to criminal liability, is entirely different from the concept of a nonlitigant's mental capacity in a civil case. Whether Alex had the mental capacity to *intend* his actions is to me much different from the question of whether he would have available to him the total defense of insanity had he survived and been prosecuted criminally. As explained above, intent is the design or desire to cause the consequences of one's acts and a belief that the consequences are very likely to result from the acts. Nothing in this record leads to the conclusion that Alex was mentally incapable of forming, even in his enraged state, the design or desire to shoot and kill three people and the belief that their deaths would likely result from the shootings. Certainly Dr. O'Gorman's conclusory reference in his affidavit to part of the M'Naghten test does not provide evidence in this civil case that Alex was so mentally deranged that he did not have the mental capacity to perform that cognitive function commonly known as *intention.* Every indication in the record suggests the conclusion that when Alex shot these three people, he desired to cause their deaths. As explained in the margin, however, there is certainly a possibility that some kinds of circumstances could, in certain cases lead to the conclu-

---

[5]Dr. O'Gorman testified that Alex had an "involutional psychotic reaction" that made him unable to "distinguish right from wrong." Dr. O'Gorman had no occasion to examine, treat or even meet Alex. An involutional psychotic reaction is a temporary mid-life reaction to events said by Dr. O'Gorman to be "psychotic" in nature. Even if we were to assume, on the basis of Dr. O'Gorman's testimony, that Alex did suffer a temporary disease of mind and a defect of reason that prevented him from realizing that it was wrong to shoot three people in the head, this is, of itself, not enough to render these killings "unintentional." As pointed out in the text, no one has said that Alex did not intend to kill.

sion that a person was suffering from such a mental disorder as to be incapable of forming the intent to kill.[6]

The test for capacity in criminal cases is necessarily different from the test that must be applied in the present case. In the criminal law, we are interested in *mens rea*, the guilty mind, and in moral reprehensibility. We want to know, in criminal cases, whether a person is justly deserving of punishment or not. The rationale of the insanity defense is that it is not fair, reasonable or just to punish a person for a crime when that person does not understand what he or she is doing or is so deluded as to believe that criminal acts are right and proper. These concepts have no bearing on the case at hand. The criminal law deals with a particular species of mental incapacity that has meaning only when associated with the ends and purposes of the criminal law.

If the claimants' position had been that Alex did not have the mental capacity to intend to kill his wife, rather than that Alex was criminally insane under the M'Naghten rule, they should have said so and pursued the issue of Alex's mental incapacity to *intend* to kill. Insanity and the consequent freedom from criminal liability are much different from the mental capacity to perform a legal act, an act which will be deemed effective under the civil law. If this were a will contest case, for example, a person challenging the mental capacity of a testator to execute a will would have to introduce evidence showing that the testator did not have the capacity to understand the nature of the estate and the ordinarily expected objects of the will rather than testimony relating to the testator's incompetency to commit a crime. If a person's capacity to marry or to make a contract were the subject of litigation, testimony based on the M'Naghten rule would not be very useful or pertinent to the issues at hand. The issue in this case is whether, under the terms of this insurance policy, Alex intended to kill his victims. The claimants' expert witness, Dr.

---

[6]For instance, if there were psychological evidence that Alex thought that he was doing something other than discharging bullets into the bodies of three human beings, then it would be possible that Alex did not desire to cause the consequences of his acts, *i.e.*, the killing of three human beings. In such a case, we might be willing to let such evidence go to a jury on the issue of whether these killings were "intentional acts."

There are other circumstances in which the mental condition of a person might prevent that person from being mentally able to commit an intentional act. If, for example, a mother were suffering under such a delusion that she believed that the devil had taken over the body of her infant child and, acting under such a delusion, hurled the child from the window of a tall building, under such circumstances the conclusion that the woman did not *intend* to kill *her child* might be accepted. The mother in this example did not have the design, or the desire, to kill *her child*. Instead, her *intention* was to assail the devil; consequently, with regard to the child her actions might not be considered to be "intentional acts."

Glovinsky, testified that Alex did intend to kill the victims. There is no evidence to the contrary.

In sum, then, there is no evidence to support the contention that these casualties were accidents or were caused by anything other than the intentional acts of Alex. There is affirmative evidence that Alex's acts were intentional. The trial court was correct in refusing to allow a jury to decide either that Alex did not intend to kill or that he did not have the mental capacity to make such a decision. The summary judgment of the trial court is, therefore, affirmed.

STEFFEN and YOUNG, JJ., and WHITEHEAD, D. J., concur.[7]

HANDELSMAN, D. J., dissenting:

As explained below, I believe that genuine issues of material fact exist in this case. Therefore, I must respectfully dissent.

## BACKGROUND

This is an appeal from two summary judgments entered against the appellants in actions that were consolidated below. The actions arose out of the killings of three people by Alex Egyed, who committed suicide immediately after the killings. On September 22, 1984, Egyed's wife, Virginia Mallin, along with her friends Nina Schwartz, Betty Di Fiore, and Jack Levy, went to a charity banquet at Caesar's Palace in Las Vegas. Egyed also attended the banquet and was hostile toward Mallin and her friends. Although they had previously received counseling, Egyed and Mallin were having continuing marital difficulties. Earlier that day, Mallin told Schwartz that she wanted to stay with her, and Schwartz let her stay in a guest room. Farmers concedes that Egyed was a jealous and possessive husband and that he hated his wife's friends. Moreover, at the hearing pertaining to Farmers' motions for summary judgment, Mallin's daughter, Jessica, testified that Egyed was very depressed and distraught and that he had been drinking alcohol that evening.

Mallin was upset and embarrassed by Egyed's behavior at the banquet. She asked her friends to drive her home so she could remove her daughter, Jessica, from the premises. Egyed also returned home and asked Mallin to talk with him. When she refused, Egyed went upstairs and found a gun.

Egyed first went to Jessica's room and found Jessica, a friend of Jessica's, and Di Fiore. He shot Di Fiore in the head and pointed the gun toward Jessica. According to Jessica, he appeared

[7]The Honorable Jerry C. Whitehead, Judge of the Second Judicial District, was designated by the Governor to sit in the place of THE HONORABLE ROBERT E. ROSE, Justice. Nev. Const. art. 6, § 4.

to be in a wild frenzy and looked out of control. He refrained from shooting Jessica, however, and went downstairs. He found his wife in the kitchen, made her kiss his foot, and shot her in the head. He then ran to Levy's car and shot him in the head. Schwartz crouched behind the front seat of the car and was not shot. After shooting Levy, Egyed returned to the house, turned the gun on himself, and committed suicide.

After the killings, various claims were filed against Egyed's estate by the estates and heirs of the victims. Egyed's estate reported the claims to Farmers Insurance Exchange (hereinafter, Farmers), the issuer of a homeowner's insurance policy covering Egyed, and demanded that Farmers either indemnify the estate or defend the actions.

The homeowner's policy issued by Farmers states, in pertinent part, as follows:

> We shall pay all damages from an accident which an insured is legally liable to pay of bodily injury or property damage covered by this policy.

"Accident" is defined as a "sudden event, including continuous or repeated exposure to the same conditions, resulting in bodily injury or property damage neither expected nor intended by the insured." In addition, the "Exclusions" section of the policy provides that Farmers will not cover bodily injury or property damage "[a]rising as a result of intentional acts of the insured," nor "bodily injury to any resident of the household."

Farmers initially provided a defense, but subsequently filed a separate declaratory relief action against Egyed's estate and against the plaintiffs in the actions filed against Egyed's estate. Farmers sought a declaration of noncoverage pursuant to the "intentional acts" and "household resident" exclusions.

Thereafter, these cases were consolidated for discovery purposes only. Following discovery, Farmers filed two separate motions for summary judgment. One motion was directed toward the claims asserted by the Estate of Virginia Mallin and her daughter Jessica, and was based upon the "household resident" exclusion. The second motion sought a final determination of noncoverage as to all actions against Egyed's estate based upon the "intentional acts" exclusion. Both of these motions were granted and the rulings were certified as final pursuant to NRCP 54(b).[1]

---

[1]A more detailed account of the procedural history of these actions is set forth in *Mallin v. Farmers Ins. Exch.*, 106 Nev. 606, 797 P.2d 978 (1990).

## DISCUSSION

### A. Standards Applicable to Summary Judgments

The standards applicable to motions for summary judgment have been stated often, but bear repeating. A party seeking to recover upon a claim may move for a summary judgment in his favor upon all or any part of that claim. NRCP 56(a). The motion must be granted if the following requirements are satisfied:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Id.* 56(c). *See* Ferreira v. P.C.H. Inc., 105 Nev. 305, 306, 774 P.2d 1041, 1042 (1989).

In deciding whether summary judgment is appropriate, the evidence must be viewed in the light most favorable to the party against whom summary judgment is sought, and the factual allegations of that party must be presumed correct. *See id.;* Pacific Pools Constr. Co. v. McClain's Concrete, Inc., 101 Nev. 557, 559, 706 P.2d 849, 851 (1985). In addition, the burden of establishing the non-existence of any genuine issue of fact is on the movant. Pacific Pools, 101 Nev. at 559, 706 P.2d at 851; Butler v. Bogdanovich, 101 Nev. 449, 451, 705 P.2d 662, 663 (1985). A litigant has the right to a trial when there remains the slightest doubt as to remaining issues of fact. Pacific Pools, 101 Nev. at 559, 706 P.2d at 851; Oak Grove Investors v. Bell & Gossett Co., 99 Nev. 616, 623, 668 P.2d 1075, 1079 (1983).

### B. Killing as an "Accident"

I view this case as presenting rather straightforward issues of contract interpretation. Generally, the issue is whether the actions of Egyed are covered under the terms of the homeowners' insurance policy issued to Egyed by Farmers. The first sub-issue is whether killing can be considered an "accident." Although this Court has not specifically held that an individual's insanity may negate his or her intent to commit an act, courts from other jurisdictions have held that a killing or suicide may be "accidental" for purposes of insurance coverage if the actor was insane at the time of the act. *See, e.g.,* Sturm v. Washington Nat'l Ins. Co., 208 F.2d 97, 100-02 (8th Cir. 1953) (suicide by an insane insured constituted accidental death for purposes of life insurance coverage), *cert. denied,* 347 U.S. 918, 74 S.Ct. 516, 98 L.Ed. 1073 (1954); Continental Casualty Co. v. Maguire, 471 P.2d 636, 638-39 (Colo.App. 1970) (insured's actions were not voluntary due to his insanity, and his injuries were therefore caused by

accident); Gulf Life Ins. Co. v. Moore, 60 S.E.2d 547, 550-51 (Ga.App. 1950) (plaintiff could recover on a life insurance policy providing benefits for accidental death based upon evidence that assailant of her deceased husband was insane at the time of killing); Ray v. Federated Guar. Life Ins. Co., 381 So.2d 847, 848 (La.App. 1980) (insured was insane at the time he drowned himself, and his drowning was therefore accidental); State ex rel. Kansas City Life Ins. Co. v. Bland, 184 S.W.2d 425, 426 (Mo. 1945) ("suicide while insane is considered an accident, whereas suicide while sane is considered not an accident"); Travelers Ins. Co. v. Gray, 306 N.E.2d 189, 191 (Ohio C.P. 1973) (killing by an insane person would be an accidental killing).

The reasoning of these cases is sound. An individual's mind may be so protracted by disease that he is unable to form an intent. See Fox v. State, 73 Nev. 241, 244, 316 P.2d 924, 926 (1957). In that situation, the individual's acts may properly be termed "accidental" for purposes of insurance coverage, regardless of whether those acts appear "intentional" to the uninformed observer. Thus, a killing could reasonably be considered an "accident" for purposes of the insurance policy issued to Egyed by Farmers.

## C. "Intentional Acts" Exclusion

The next question is whether the exclusion in the Farmers' policy pertaining to "intentional acts" bars any recovery by the appellants in this case. The majority answers this question in the affirmative and believes that conclusion is the only reasonable conclusion. I disagree.

### 1. Ambiguity of the "Intentional Acts" Exclusion

The "intentional acts" exclusion relied upon by Farmers excludes from coverage "bodily injury . . . [a]rising as a result of intentional acts of the insured." Farmers argues, and the majority agrees, that this provision precludes coverage regardless of whether Egyed was insane at the time of the shootings.

Farmers relies primarily on Johnson v. Insurance Co. of N. Am., 350 S.E.2d 616 (Va. 1986), to support this contention. In Johnson, the Virginia Supreme Court held that, notwithstanding an insured's delusional belief as a reason for shooting a friend, he was aware of what he was doing and intended the resulting injury. Thus, the defendant insurance company was permitted to avoid coverage under an insurance policy exclusion for bodily injury which is "either expected or intended from the standpoint of the insured."

As an initial matter, the Johnson case was in a procedural posture different from the case at bar. In Johnson, the Virginia

Supreme Court was reviewing the trial court's final judgment on the insurer's action for a declaratory judgment. Unlike the case at bar, the trial court's judgment in Johnson was not rendered based upon a motion for summary judgment and the trial court was therefore permitted to weigh the evidence and draw any proper inferences. The district court in the case at bar was not entitled to weigh evidence and draw inferences in favor of Farmers.

Moreover, the Johnson decision espouses the minority view on this issue. *See also* Kipnis v. Antoine, 472 F.Supp. 215, 220-21 (N.D.Miss. 1979); Colonial Life & Accident Ins. Co. v. Wagner, 380 S.W.2d 224, 226-27 (Ky. 1964); Deloache v. Carolina Life Ins. Co., 104 S.E.2d 875, 875-76 (S.C. 1958). The majority of courts have held that acts committed by an insane insured are not considered "intentional" for purposes of insurance coverage. *See* Rosa v. Liberty Mut. Ins. Co., 243 F.Supp. 407, 409 (D.Conn. 1965); Globe Am. Casualty Co. v. Lyons, 641 P.2d 251, 253-54 (Ariz.App. 1981); Congregation of Rodef Sholom v. American Motorists Ins. Co., 91 Cal.App.3d 690, 695-99, 154 Cal.Rptr. 348, 350-52 (1979); Mangus v. Western Casualty & Sur. Co., 585 P.2d 304, 305-06 (Colo.App. 1978); George v. Stone, 260 So.2d 259, 261-62 (Fla.App. 1972); West Am. Ins. Co. v. McGhee, 530 N.E.2d 110, 111-12 (Ind.App. 1988); von Dameck v. St. Paul Fire & Marine Ins. Co., 361 So.2d 283, 288-89 (La.App. 1978), *cert. denied,* 362 So.2d 794 and 802 (La. 1978); State Farm Fire & Casualty Co. v. Wicka, 461 N.W.2d 236, 242 (Minn.App. 1990), *aff'd as modified,* 474 N.W.2d 324 (Minn. 1991); Ruvolo v. American Casualty Co., 189 A.2d 204, 208 (N.J. 1963); Nationwide Mut. Fire Ins. Co. v. Turner, 503 N.E.2d 212, 216-17 (Ohio App. 1986). The Wicka court explained why the Johnson view should be rejected:

> We believe that the rule adopted by the majority of the courts in this country is the better rule. A narrower interpretation of the exclusionary clause is not unreasonable, but ambiguities, particularly in exclusions are construed against the insurer. This is especially true when the conduct insured against involves injury to members of the public and when the policy rationale behind the clause is inapplicable. In our view, an insured could reasonably expect liability coverage for injuries resulting from acts committed at a time when, because of mental illness, the insured is unable to control his or her conduct in accordance with reason.

Wicka, 461 N.W.2d at 240.[2]

---

[2]The Minnesota Supreme Court expressly rejected views it termed as "liberal" and "narrow." In affirming the appellate court's decision, however, the high court stated as follows:

I agree that ambiguous insurance policy provisions, including exclusion provisions, are to be strictly construed against the insurer and in favor of the insured. *See* Catania v. State Farm Life Ins. Co., 95 Nev. 532, 534-35, 598 P.2d 631, 633 (1979). The "intentional acts" exclusion in the Farmers policy covering Egyed is ambiguous as to whether the acts of an insane insured are excluded from coverage and the provision therefore must be construed against Farmers. In this regard, this Court's decision in Hernandez v. First Fin. Ins. Co., 106 Nev. 900, 802 P.2d 1278 (1990), cited by Farmers, is inapposite because the provision at issue in Hernandez was not ambiguous.

Simply put, Farmers could easily have defined the term "intentional acts" to include acts committed by an insane insured, as insurance companies have been doing for many years. Instead, Farmers chose to leave this term undefined. Any ambiguity in that term must therefore be construed against Farmers. Thus, for purposes of the "intentional acts" exclusion in Egyed's insurance policy, I would hold that acts committed by an insane person are not excluded from coverage by this exclusion as a matter of law.

### 2. Evidence of Egyed's Incapacity

I must also disagree with the majority's conclusion that "there is no evidence that the casualties in this case did not result from intentional acts of the insured." At the hearing on Farmers' motions for summary judgment, appellants proffered evidence that Egyed was incapable of forming an intent to commit the killings. Jessica Mallin, Egyed's stepdaughter, testified that she spent the evening of September 22, 1984, at home with Egyed, until he left for the banquet. She testified that Egyed was very depressed and distraught that evening, and that he had been drinking alcohol. She also testified that he appeared to be in a wild frenzy and looked out of control when he shot Di Fiore. Another lay witness, Schwartz, testified to Egyed's hostile behavior toward his wife and her friends at the banquet.

---

Although we reject the formulations advanced under both the liberal and narrow views, we agree that an insured's mental illness can defeat the application of the intentional act exclusion . . .

. . .

. . . We hold, therefore, that for purposes of applying an intentional act exclusion contained in a homeowner's insurance policy, an insured's acts are deemed unintentional where, because of mental illness or defect, the insured does not know the nature or wrongfulness of an act, or where, because of mental illness or defect, the insured is deprived of the ability to control his conduct regardless of any wrongdoing of the nature of the act or its wrongfulness . . . .

474 N.W.2d at 329-31. The court also held that the question of whether the above circumstances exist is one for the trier of fact. *See id.* at 331.

In addition to the personal observations of Jessica and other lay witnesses, appellants also proffered expert witness testimony. Psychiatrist Robert Lynn Horne, M.D., offered his opinion that, at the time of the shootings, Egyed "was suffering from a compulsive personality disorder and a paranoid personality disorder further effected by alcohol ingestion." Dr. Horne also stated that "Egyed was unable to control his acts at the time of the shootings in question, and could not consciously decide to kill Betty Di Fiore, Jack Levy and Virginia Mallin Egyed."

William D. O'Gorman, M.D., another psychiatrist, concluded that "Egyed was suffering from an involutional psychotic reaction manifested by deep seated depression, suspiciousness and paranoid ideation." In the opinion of Dr. O'Gorman, "Egyed, as a result of the above-described mental state, was unable to control his acts at the time of the homicides in question and was further unable to distinguish right from wrong."

Psychologist Marv A. Glovinsky provided marital counseling to Egyed and Mallin until January 1984. Dr. Glovinsky testified in his deposition that "Egyed was unable to control his acts at the time of the homicides." According to Dr. Glovinsky, Egyed was unable to decide not to commit the acts and was overcome by his emotions to the degree that he was unable to make the rational decision not to commit the acts. Egyed became psychotic early in the evening on the night of the shootings and his psychotic state escalated to a point at which he lost control, was unable to distinguish the elements of reality and totally lost touch with reality. Dr. Glovinsky also testified that Egyed's ability to govern his acts at the time of the shootings was virtually nil.

Appellants presented considerable evidence concerning Egyed's deranged mental state. In the face of this evidence, the majority chooses, instead, to infer Egyed's intent from his actions on the night of the shooting. I agree that this inference can properly be drawn from the record before us. I cannot say, however, that this is the only inference that may be drawn. From the evidence presented by appellants, a reasonable juror could conclude that Egyed's psychosis was so pervasive that his acts should not be considered "intentional." The district court was required to view the evidence presented in the light most favorable to appellants. Instead, the court improperly drew an inference from the evidence favorable to Farmers. *See* Johnson v. Steel, Inc., 100 Nev. 181, 183, 678 P.2d 676, 677-78 (1984) (nonmoving party on a motion for summary judgment is entitled to have its evidence and all inferences therefrom accepted as true); Orcutt v. Miller, 95 Nev. 408, 411, 595 P.2d 1191, 1193 (1979) (facts and inferences must be viewed in the light most

favorable to the nonmoving party on a motion for summary judgment).

The majority accepts Farmers' contention that Egyed's intent, and therefore sanity, may be inferred from his selection of victims and from the execution-style slaying of those victims. I agree that this is an inference that the trier of fact may draw from the record before us, but I reject the majority's conclusion that this evidence points to only one reasonable conclusion. Egyed's apparent ability to draw distinctions does not compel a finding of sanity:

> Talking irrationally could be indicative of an unsound mind. But the converse, talking normally, does not negate the more subtle and insidious forms of insanity with which the mind may be possessed.

State v. Overton, 562 P.2d 726, 729 (Ariz. 1977). Conflicting inferences as to an individual's sanity raise a genuine issue of material fact and render summary judgment inappropriate. *See* George v. Stone, 260 So.2d 259, 262 (Fla.App. 1972).

Moreover, the term "intent" is a slippery one, subject to myriad applications. In this case, we must draw a distinction between Egyed's arguably volitional act of pulling a trigger and his mental capacity to kill, or to refrain from killing. These two "intents" are different and should not be confused. Certainly, one can infer an intent to kill from the volitional act of pulling a trigger, but this conclusion is not mandatory.

Farmers refers to several cases in which other jurisdictions have inferred an individual's intent to injure based upon the acts committed. In principle, Farmers is correct: An actor's intent can be inferred from his or her acts in certain cases. As this Court recently indicated in Rivera v. Nevada Medical Liab. Ins. Co., 107 Nev., Adv. Op. 70, at 4, 814 P.2d 71, 73 (1991), some acts are substantially certain to injure and an intent to injure may be inferred from the intentional commission of those acts regardless of the actor's subjective intent. This principle, however, presupposes a sane mind. When, as in this case, the parties opposing a motion for summary judgment have presented evidence on an actor's lack of mental capacity or sanity, the actor's intent to commit murder cannot be inferred from the act of shooting his or her victims. *See* Congregation of Rodef Sholom, 91 Cal.App.3d at 695-99, 154 Cal.Rptr. at 350-52 (1979); Arkwright-Boston Mfrs. Mut. Ins. Co. v. Dunkel, 363 So.2d 190, 193-94 (Fla.App. 1978); von Dameck v. St. Paul Fire & Marine Ins. Co., 361 So.2d 283, 288-89 (La.App. 1978); Allstate Ins. Co. v. Miller, 438 N.W.2d 638, 641-42 (Mich.App. 1989), *remanded,* 452 N.W.2d 209 (Mich. 1990), *after remand,* 460 N.W.2d 612

(Mich.App. 1990); Wicka, 461 N.W.2d at 242; Nationwide Mut. Fire Ins. Co. v. Turner, 503 N.E.2d 212, 216-17 (Ohio App. 1986).

### 3. Evidence of Egyed's Intoxication

Appellants also presented evidence during the summary judgment hearing below that Egyed had a blood-alcohol content of .10% at the time of his death. In my view, intoxication may be relevant for purposes of determining coverage under a policy exclusion for "intentional acts" if the insured's intoxication at the time of the act was so significant that the insured was unable to form the requisite intent to commit the act. In determining the insured's intent for these purposes, lack of capacity is the key issue. Without question, an insured's intoxication can be so severe as to render the insured incapacitated.

I do not mean to suggest that an insured's intoxication relieves the insured from liability for wrongful acts committed while intoxicated. I would hold only that under the language of this "intentional acts" exclusion, an intoxicated insured who causes injury or damage may still be covered if the insured was so intoxicated that he or she was incapable of forming an intent to commit the acts causing injury or damage. Moreover, I realize that this holding would have the anomalous result of making insurance coverage for wrongful acts more likely as the insured's degree of intoxication increases. Nevertheless, insurers are the parties responsible for the language used in their policies. Insurers are the only parties in a position to exclude coverage for damage or injury caused by an intoxicated insured. As discussed above, the language in this policy exclusion is ambiguous and must be construed against the insurer.

Other courts have considered this issue. A few have denied coverage under the relevant policy exclusions due to the insured's voluntary intoxication. *See* Prudential Property & Casualty Ins. Co. v. Kerwin, 576 N.E.2d 94, 97-98 (Ill.App. 1991), *appeal denied,* ...... N.E.2d ...... (Ill. 1991); Allstate Ins. Co. v. Hampton, 433 N.W.2d 334, 336 (Mich.App. 1988); Coleman v. Sanford, 521 So.2d 876, 878 (Miss. 1988); Hanover Ins. Co. v. Newcomer, 585 S.W.2d 285, 289 (Mo.App. 1979); Aetna Life Ins. Co. v. McLaughlin, 380 S.W.2d 101, 102-06 (Tex. 1964). My view, however, is in accord with a large majority of courts that have considered this issue. *See* Lawler Mach. & Foundry Co. v. Pacific Indem. Ins. Co., 383 So.2d 156, 158 (Ala. 1980); Parkinson v. Farmers Ins. Co., 594 P.2d 1039, 1041 (Ariz.App. 1979); State Farm Fire & Casualty Co. v. Morgan, 368 S.E.2d 509, 510 (Ga. 1988); Allstate Ins. Co. v. Carioto, 551 N.E.2d 382, 389 (Ill.App. 1990), *appeal denied,* 555 N.E.2d 374 (Ill.

1990); Perilloux v. Nelson, 378 So.2d 551, 552-53 (La.App. 1979); Wicka, 461 N.W.2d at 240-41; MacKinnon v. Hanover Ins. Co., 471 A.2d 1166, 1169 (N.H. 1984); Burd v. Sussex Mut. Ins. Co., 267 A.2d 7, 15 (N.J. 1970); Moorman v. National Casualty Co., 68 N.E.2d 359, 360 (Ohio Mun. 1946), *rev'd on other grounds,* 75 N.E.2d 806 (Ohio App. 1947); Williams v. Pilgrim Life Ins. Co., 452 A.2d 269, 271 (Pa.Super. 1982); Long v. Coates, 806 P.2d 1256, 1259-60 (Wash.App. 1990), *review denied,* 807 P.2d 884 (Wash. 1991); Morris v. Farmers Ins. Exch., 771 P.2d 1206, 1214-15 (Wyo. 1989).

Egyed's intoxication has significance for another reason. Dr. Horne testified that Egyed's intoxication contributed to his psychosis. This evidence is directly relevant to the issue of Egyed's sanity and should be considered by the trier of fact. For all the foregoing reasons, I must disagree with the majority's conclusion that there is no evidence that Egyed's acts were not intentional. Rather, I believe there is sufficient evidence from which a jury could determine that appellants' should be permitted to recover under Egyed's insurance policy.

### 4. Public Policy in Finding Coverage

Although not discussed by the majority, Farmers also argues that the "intentional acts" exclusion should apply to Egyed's conduct in this case based upon public policy. Farmers asserts that the public policy underlying this "intentional acts" exclusion is that an insured should not profit from his own intentional wrongdoing. According to Farmers, a finding that coverage for these claims exists would clearly undermine this policy because insurance proceeds would insulate the assets of Egyed's estate from the actions filed by the estates and heirs of Egyed's victims.

This argument, however, begs the question of whether Egyed's acts were "intentional." As discussed above, the issue of Egyed's intent in this case cannot be decided on this motion for summary judgment. If the trier of fact finds that Egyed lacked the capacity to form an intent, there is little compelling about Farmers' policy goals. No significant public policy will be served by depriving an individual of insurance coverage for acts committed while he or she was insane or otherwise incapacitated. An individual who lacks the capacity to conform his or her conduct to the law will be uninfluenced by the existence or nonexistence of insurance coverage for the consequences of that conduct. *See* Lyons, 641 P.2d at 253-54. Further, as stated by the Wicka court, there is a strong public interest in the compensation of victims. *See* Wicka, 461 N.W.2d at 240. *See also* Congregation of Rodef Sholom, 91 Cal.App.3d at 697, 154 Cal.Rptr. at 352. Under these circumstances, I must reject Farmers' public policy arguments.

The majority highlights statements by Dr. Glovinsky that Egyed had the intent to kill his wife, and concludes that the trial court was therefore justified in granting Farmers' motions for summary judgment. Apparent inconsistencies in the testimony of a given witness are not new to our judicial process. Attorneys use such inconsistencies in cross-examination every day, sometimes to great effect. In this case, too, Farmers' attorneys would have had the opportunity to attack the testimony of Dr. Glovinsky and appellants' other witnesses. Ultimately, the appropriate place to weigh the credibility of a given witness should have been the deliberation room.

The majority also appears troubled by "[t]hose who . . . believe that unconscious and unwilled mental forces, and not individual will or intent, cause human actions." I do not regard these two alternatives as absolutes. Rather, unconscious mental forces *and* individual will, either separately or in conjunction, can affect human actions. The majority need not have presented themselves with such an imposing metaphysical dilemma; the issue in this case is relatively mundane.

Farmers and Egyed entered into a contractual agreement. Under this agreement, Farmers agreed to provide insurance coverage for all damages from an accident which Egyed would be legally liable to pay. Coverage was not applicable to damages caused by Egyed's "intentional acts." This exclusion begs the question, however, of whether the acts committed by Egyed were "intentional." The policy did not state whether damages caused by acts of an insane insured were "intentional." Since that term is ambiguous, it must be construed against Farmers and in favor of appellants. We are left with the task of determining whether Egyed was incapacitated at the time of the killings. That issue is a question of fact and should have been resolved by a jury.

The majority's analogy to criminal law is also inapposite. The majority correctly observes that the defense of "irresistible impulse" has been rejected by this Court. *See* Sollars v. State, 73 Nev. 248, 253-55, 316 P.2d 917, 920 (1957). That holding, however, has no relevance to the case at bar. As explained above, this is a case of contract interpretation, presented on a motion for summary judgment. An insurance company is free to agree to provide coverage for damages caused by the acts of an insane insured. It is also free to decline to provide such coverage. If the agreement is ambiguous with regard to that issue, the ambiguity must be construed against the insurer. All that remains is for the jury to determine whether the insured was, or was not, insane when the acts were committed. Contrary to the majority's conclusion, there is *no* relationship between the insanity defense in criminal cases, and the constructive agreement of an insurer to

provide coverage for damages caused by an insane insured. Moreover, I believe that appellants clearly articulated their contention that Egyed did not have the mental capacity to intend to kill.

## 5. Estoppel of Appellants

Although not discussed by the majority, Farmers also contends that appellants should be estopped from arguing that Egyed lacked the mental capacity to form an intent to kill. Farmers points to allegations set forth in appellants' separate actions against Egyed's estate. In those actions, appellants allege negligent and intentional misconduct by Egyed. Moreover, in probate proceedings relating to Egyed's estate, Jennifer Mallin, Jessica Mallin, and the executrix of the Estate of Virginia Mallin each claimed that Egyed murdered Virginia Mallin. The trial court apparently found these allegations disturbing:

> This Court notes that in this particular proceeding the defendants claim Alex Egyed lacked the intent to commit an intentional act, while at the wrongful death proceedings and probate proceedings, the various defendants claimed that Alex Egyed acted with some type of intent. The defendants have conveniently tailored Alex Egyed's intent differently depending on which proceeding is taking place.

Collateral estoppel serves only to prohibit parties or their privies from relitigating issues actually litigated and necessarily determined in a previous lawsuit. State v. Kallio, 92 Nev. 665, 668, 557 P.2d 705, 707 (1976). Until a particular issue is actually litigated and adjudicated, parties are free to make alternative or inconsistent allegations regarding that issue. *See* NRCP 8(e)(2) (in pleadings, parties may set forth as many inconsistent and alternative claims as they have). *See also* Paradise Palms Community Ass'n v. Paradise Homes, 89 Nev. 27, 31-32, 505 P.2d 596, 598-99 (1973) (collateral estoppel is inapplicable until there has been a final judgment on the merits), *cert. denied,* 414 U.S. 865, 94 S.Ct. 129, 38 L.Ed.2d 117 (1973). Inconsistent allegations in alternative claims cannot be used as admissions. Trans W. Leasing Corp. v. Corrao Constr. Co., 98 Nev. 445, 448, 652 P.2d 1181, 1183 (1982); Auto Fair, Inc. v. Spiegelman, 92 Nev. 656, 658, 557 P.2d 273, 275 (1976).

Farmers has presented no evidence that the issue of Egyed's intent was fully adjudicated in any other proceeding. Indeed, notwithstanding the statements quoted above, the district court specifically rejected Farmers' argument that appellants should not be permitted to argue Egyed's lack of capacity at the hearing

below because of allegations in the related proceedings. Moreover, Farmers failed to cite even one authority supporting its estoppel argument.

In addition, certain allegations in the related proceedings are not necessarily inconsistent with appellants' arguments pertaining to Egyed's mental incapacity. For example, an allegation that Egyed's conduct was "wrongful" does not necessarily imply that the conduct was intentional. Even if Egyed is found to have lacked the mental capacity to form an intent to kill, his estate remains liable for certain wrongful acts committed by Egyed prior to his death, including wrongful death. *See* Polmatier v. Russ, 537 A.2d 468, 469-71 (Conn. 1988); Barylski v. Paul, 196 N.W.2d 868, 869-70 (Mich.App. 1972); Ross v. York, 233 S.W.2d 347, 348-49 (Tex.Civ.App. 1950). Appellants' wrongful death actions against Egyed's estate are not inconsistent with their arguments that he was insane at the time of the killings.

In the probate proceedings relating to Egyed's estate, the estate and heirs of Virginia Mallin sought to prohibit Egyed from succeeding to Mallin's separate and community property, and to property held in joint tenancy with Egyed prior to her death, pursuant to statute. *See* NRS 111.067, 134.007 (preventing persons convicted of murder from succeeding to the property of their victims). Ultimately, Egyed's estate entered into a settlement with these parties, without admitting applicability of these statutes, and this compromise was approved by the district court. Farmers' estoppel argument based upon these facts must fail, however, because compromises are not admissible to prove the validity or amount of a claim. NRS 48.105. In addition, no criminal court has ruled that Egyed "murdered" his victims, a prerequisite to an application of NRS 111.067 and 134.007. *See* Holliday v. McMullen, 104 Nev. 294, 296, 756 P.2d 1179, 1180 (1988).

### D. "Household Resident" Exclusion

Farmers also argues that it should not be required to provide coverage for injuries alleged by Jessica Mallin and the Estate of Virginia Mallin based upon a "household residents" exclusion set forth in the homeowner's policy. That exclusion provides that Farmers will not cover "[b]odily injury to any resident of the household except a resident employee." Farmers contends that Virginia and Jessica Mallin were "household residents," as a matter of law, at the time Virginia Mallin was killed.

#### 1. Enforceability of "Household Resident" Exclusion

The Mallin appellants have raised an issue regarding the

enforceability of the "household resident" exclusion at issue in this case. They argue that the exclusion should be considered part of a contract of adhesion because the insureds were not given an option as to whether the exclusion should be part of their home-owner's policy. Although unconscionable contract provisions are voidable, adhesion contracts are not unenforceable per se. *See, e.g.*, Adams v. Merrill Lynch Pierce Fenner & Smith, 888 F.2d 696, 701 (10th Cir. 1989). The "household resident" exclusion exists to protect insurance companies from the natural partiality of the insured to assist the injured person when he or she is a member of the family circle. Even without actual dishonesty appearing, the natural bias and sympathies of the insured might easily render every such claim a dangerous one. *See* 6C J. Appleman, *Insurance Law and Practice*, sec. 4411, at 345-46 (Buckley ed. 1979). This reasoning is sound, and the Mallin appellants' unconscionability argument must therefore be rejected. The real issue in this case is not one of enforceability, but of applicability.

### 2. Evidence of Nonresidency

The meaning of the term "resident" is not absolute and must be determined in a particular case by viewing all relevant circumstances. *See* Hartford Ins. Group v. Winkler, 89 Nev. 131, 136, 508 P.2d 8, 11 (1973). Necessarily, the issue of whether an individual is a "resident" for purposes of this policy exclusion is one of fact for the jury. In resolving the issue of "residency," the trier of fact may consider a variety of factors, including the following: (1) subjective or declared intent of the individual to remain indefinitely in the household, (2) formality of the relationship between the individual and the householder, (3) whether the individual and householder live in the same house or premises, (4) whether the individual has another place of lodging, and (5) any circumstances surrounding the individual's presence or absence from the home. Workman v. Detroit Auto. Inter-Insurance Exch., 274 N.W.2d 373, 379-80 (Mich. 1979); Government Employees Ins. Co. v. Dennis, 645 P.2d 672, 676 and n.2 (Utah 1982). With these factors in mind, we must determine whether a genuine issue of material fact exists with regard to whether Virginia and Jessica Mallin were "household residents" at the time of the killings.

The Mallin appellants base their argument for nonresidency upon several facts presented at the hearing below. They point out that the day before the killings, Virginia Mallin told her friend, Nina Schwartz, that she wanted to stay with Schwartz. Schwartz agreed and permitted Mallin to stay in the guest room. On that

same day, Mallin had clothes delivered to Schwartz' residence. Schwartz testified that she believed Mallin was moving in with her. In addition, the Mallin appellants assert that the sole reason that Mallin returned to the house on the night of the killings was to remove Jessica from the premises and to take some of Jessica's clothing so she could also move in with Schwartz. Moreover, although Egyed and Virginia Mallin had marital counseling prior to the killings, Egyed was still exhibiting hostility toward Mallin, as shown by his behavior at the banquet. The Mallin appellants argue that these facts show Virginia Mallin's intent to permanently remove herself and her daughter from the house.

These circumstances raise a genuine issue of material fact with regard to whether Virginia and Jessica Mallin were "household residents" at the time of the killings. Specifically, the Mallin appellants presented evidence concerning Virginia Mallin's intent that she and her daughter move out of the house and begin living with Schwartz. Intent is critical to the determination of residency in cases pertaining to insurance coverage and exclusions. *See* Country Mut. Ins. Co. v. Watson, 274 N.E.2d 136, 138 (Ill.App. 1971); Bearden v. Rucker, 437 So.2d 1116, 1121 (La. 1983). In this regard, the statements of Jessica Mallin regarding her understanding as to her "residence," although relevant, are not dispositive.

Moreover, these facts raise an issue as to whether Virginia Mallin was going to terminate her and Jessica's relationship with Egyed, another significant factor with regard to a determination of residency. *See* Pamperin v. Milwaukee Mut. Ins. Co., 197 N.W.2d 783, 787-88 (Wis. 1972). As stated by the Utah Supreme Court:

> Residence emphasizes membership in a group rather than an attachment to a building. It is a matter of intention and choice rather than one of geography.

American States Ins. Co. v. Walker, 486 P.2d 1042, 1044 (Utah 1971). *See also* Winkler, 89 Nev. at 136-37, 508 P.2d at 12 ("an insurance company should [not] be able to avoid liability under ambiguous provisions of a policy—by attempting to require the spouse of the policy owner as an 'insured' to remain under the same roof and in the same physical household during the legal existence of a marriage") (quoting Aetna Casualty & Sur. Co. v. Miller, 276 F.Supp. 341, 248 (D.Kan. 1967). A reasonable juror could conclude from these facts that the family relationship had disintegrated and that Virginia and Jessica Mallin were no longer residing with Egyed.

Likewise, the trier of fact may determine that Virginia and

Jessica Mallin were not members of the same "household" as Egyed. If departure from a relationship is highly probable, one need not have another place of abode in order to prevent or terminate residency in the household. *See* Novak v. State Farm Mut. Auto. Ins. Co., 293 N.W.2d 452, 456 (S.D. 1980); Pamperin, 197 N.W.2d at 787.

Farmers failed to define either "household" or "resident" in the policy at issue. These terms are fraught with ambiguity and Farmers easily could have resolved much of this uncertainty by defining those terms. As stated previously, ambiguities in insurance policies must be construed against the insurer. Thus, on remand, the trier of fact need not determine whether Virginia and Jessica Mallin were or were not "household residents" at the time of the killings. Rather, the trier must decide whether one could reasonably conclude from all the relevant circumstances that Virginia and Jessica Mallin were not "household residents" at that time. If the trier answers this question affirmatively—that is, if appellants' interpretation of the relevant circumstances is a reasonable one—then the "household resident" exclusion is inapplicable.

Farmers contends that even if Virginia and Jessica Mallin were residing with Schwartz, the "household resident" exclusion would be applicable based upon another policy section. That section states as follows: "Insured location means . . . [p]art of a premises not owned by an insured, but where an insured is temporarily residing." The Mallin appellants argue, however, that the Mallins were not "temporarily residing" with Schwartz, and that they had permanently left their former residence and had no intention of returning. Whether or not the Mallins were temporarily residing with Schwartz is an issue for the trier of fact. The cases cited by Farmers are inapposite. In State Farm Fire & Casualty Co. v. Lewis, 191 Cal.App.3d 960, 236 Cal.Rptr. 807 (1987), no issue was raised as to whether the insured's wife and children were residents. State Farm Fire & Casualty Co. v. Alstadt, 113 Cal.App.3d 33, 169 Cal.Rptr. 593 (1980), involved a challenge to the legitimacy of a "household resident" exclusion, but did not deal with the issue of residency. The court in State Farm Fire & Casualty Co. v. Clendening, 150 Cal.App.3d 40, 197 Cal.Rptr. 377 (1983), held only that the exclusion was not in violation of public policy. That court was not confronted with any issues concerning residency. Likewise, the two Nevada cases cited by Farmers, Estate of Neal v. Farmers Ins. Exch., 93 Nev. 348, 566 P.2d 81 (1977), and Baker v. Criterion Ins. Co., 107 Nev. 25, 805 P.2d 599 (1991), did not address any issues pertaining to residence.

## CONCLUSION

For all of the foregoing reasons, I would reverse the decision of the trial court and remand this case for further proceedings.[3]

---

[3]Farmers also moved for the dismissal of the appeal by the Estate of Virginia Mallin on the ground that the estate failed to file an opening brief. *See* NRAP 31(c). I would deny this motion in light of my conclusion that the summary judgments entered in this case were improper.

The Honorable Mark Handelsman, Judge of the Second Judicial District, was designated by the Governor to sit in the place of THE HONORABLE JOHN CODE MOWBRAY, Chief Justice. Nev. Const. art. 6, § 4.